FRANK M. MOODY AND GLORIA N. MOODY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Moody v. Commissioner
Docket No. 21896-82.
United States Tax Court
T.C. Memo 1985-20; 1985 Tax Ct. Memo LEXIS 605; 49 T.C.M. (CCH) 514; T.C.M. (RIA) 85020; January 14, 1985. J. Sydney Cook III, for the petitioner. Cynthia J. Mattson, for the respondent. DAWSON MEMORANDUM OPINION DAWSON, Chief Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Year
Deficiency
1978
$17,177.18
1979
18,473.77
The sole issue for our decision is whether the net losses petitioners suffered speculating in Treasury bill futures are deductible as capital losses or ordinary losses. This case was submitted fully stipulated pursuant to Rule 122. [1] The stipulation of facts and joint exhibits are incorporated herein by this reference. *606 Petitioners Frank M. and Gloria N. Moody (hereinafter petitioners) are husband and wife and were legal residents of Tuscaloosa, Alabama at the time they filed their petition in this case. They filed joint Federal income tax returns for 1978 and 1979 with the Internal Revenue Service Center in Birmingham, Alabama. They prepared their returns using the cash receipts and disbursements method of accounting. During the taxable years at issue, Frank M. Moody (petitioner) was a financial institution official. From December 6, 1976 to January 21, 1980, petitioner engaged in the commodity futures market through Clayton Brokerage Co. of St. Louis, Missouri. Petitioner traded in commodity futures contracts for the purpose of speculating on price fluctuations. He did not trade in futures for hedging purposes; nor was he a dealer in futures contracts. He did not hold the contracts for sale to customers in the ordinary course of business. Petitioner traded two types of futures, i.e., 90-day U.S. Treasury bills having a face value at maturity of $1,000,000, and silver. As a result of his trading *607 in Treasury bill futures, petitioner incurred net losses in 1978 of $57.985, and in 1979 of $43,702. Petitioners reported the losses as ordinary losses on their 1978 and 1979 Federal income tax returns. In connection with his trading in silver futures, petitioner incurred a net gain in 1978 of $31,843, and a net loss of $91,215 in 1979. Petitioners reported the net gain in 1978 as a $9,090.50 short-term capital gain and a $22,752.50 long-term capital gain on their joint Federal income tax return. Petitioners reported the net loss in 1979 as a short-term capital loss on their joint Federal income tax return. A commodity futures contract is an executory contract representing a commitment to deliver or to receive a specified quantity and grade of a commodity during a specified month in the future with the price being designated by the trading participants. Futures contracts are standardized at to the quantity of the commodity, the location, the time of delivery of the commodity and the grade or standards that are acceptable for delivery. In the United States, futures contracts are traded on an organized and federally regulated commodity exchange. The two parties to *608 a futures contract are the seller and the buyer. The seller takes a short position and the buyer takes a long position. Futures contracts are satisfied only by delivery or offset. An offset occurs when a trader executes an equal and opposite position to an earlier position, which eliminates the position in the market. For example, a seller would offset a short position in a given commodity by entering into a long position in the same commodity for the same number of contracts and for the same delivery month. Futures contracts cannot be disposed of in a secondary market, unlike the underlying commodity. Therefore, most are terminated by offset prior to delivery with only a small percentage, 1 to 3 percent, being satisfied by actual delivery. Treasury bills are short-term debt obligations of the U.S. Government. They are the primary means by which the U.S. Treasury finances the short-term cash needs of the Federal Government. Treasury bills have maturities of either three months, six months, or one year from their date of issue and come in denominations of $10,000 to $1,000,000. The return on a Treasury bill is measured as the difference between the discounted price *609 at which the bill is sold and the face value at which it matures. We must decide whether the Treasury bill futures purchased and sold by petitioner in 1978 and 1979 are capital assets under section 1221. [2] Petitioners contend that the tax treatment of Treasury bill futures should be determined by looking to the nature of the underlying asset involved, the Treasury bill. Petitioners argue that this theory is supported by Corn Products Refining Co. v. Commissioner,350 U.S. 46 (1955). In addition, petitioners contend that respondent's position, embodied in Rev. Rul. 78-414, 1978-2 C.B. 213, is erroneous, because prior to the repeal of section 1221(5) by the Economic Recovery Tax Act of 1981 (ERTA), Rev. Rul. 78-414, in effect, allowed a taxpayer to purchase a futures contract and to elect to treat gains as capital by offsetting the futures contracts, and treat losses as ordinary by leaving the contracts open and accepting delivery of the underlying commodity so that losses would be realized on the sale of the commodity itself.
*610 Respondent contends that petitioners' losses from trading in Treasury bill futures are capital losses. He argues that while a Treasury bill was excluded from the definition of a capital asset during the taxable years at issue pursuant to section 1221(5), petitioner traded in Treasury bill futures, which are executory contracts, not Treasury bills. Accordingly, respondent concludes that since Treasury bill futures are not expressly excluded under section 1221, and the positions herein were not hedges, nor were they an integral part of a business operation, the futures are capital assets and petitioners' losses are capital losses. We agree with respondent. Section 1221 defines capital assets and provides as follows: For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include-- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held *611 by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business; (3) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, * * * (4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property * * * (5) an obligation of the United States or any of its possessions, or of a State or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue; or (6) a publication of the United States Government (including the Congressional Record) which is received from the United States Government or any agency thereof, other than by purchase at the price at which it is offered for sale to the public, * * * *612 Treasury bill futures do not fall within any of the statutory exceptions to the definition of capital assets under section 1221. [3] Therefore, they must be treated as capital assets. Our conclusion finds support in analogous cases *613 in this Court that have dealt with commodity futures contracts. In Vickers v. Commissioner,80 T.C. 394 (1983), the taxpayer engaged in speculative commodity futures transactions, involving soybeans, corn, cotton, hogs, cattle, wheat and plywood, that were neither hedging transactions, nor an integral part of his day-to-day business operations. The taxpayer argued that the offset positions were a mere release of contractual rights giving rise to ordinary gains and losses, not a sale or exchange, resulting in capital gains and losses. This Court held that the positions were sales or exchanges and were deductible only as capital losses. See also Covington v. Commissioner,42 B.T.A. 601 (1940), affd. on this issue, 120 F.2d 768 (5th Cir. 1941); Patterson v. Commissioner,T.C. Memo. 1981-43, affd. without published opinion 676 F.2d 705 (8th Cir. 1982); Meade v. Commissioner,T.C. Memo. 1973-46; Gee v. Commissioner,T.C. Memo. 1964-162. Petitioners contend, however, that Treasury bill futures should be excluded under section 1221(5), which excludes Treasury *614 bills. They argue that the tax treatment of the underlying asset should determine the tax treatment of the futures contract. We do not agree. Section 1221(5) deals with Treasury bills--the asset itself--and not with Treasury bill futures. When an investor purchases a Treasury bill future, he is trading in contracts, not in the underlying asset. [4]
In addition, there is no indication in the legislative history underlying section 1221(5) that Treasury bill futures were to be excluded from capital asset treatment under section 1221(5). [5] Treasury bills were excluded from capital asset status because of the burdensome computations that taxpayers would have to make when Treasury bills were sold prior to maturity. S Rept. No. 673, 77th Cong., 1st Sess. *615 30 (1941). Taxpayers would have had to apportion the gain on the sale between the original discount on the bill (interest component) and capital gain or loss. Accordingly, petitioners' contentions find no support in this legislative history. We also reject petitioners' contention that Corn Products Refining Co. v. Commissioner,350 U.S. 46 (1955) supports their argument. In Corn Products, the taxpayer was engaged in the manufacture of corn products. It purchased corn futures in order to insure a stable price for the raw product by eliminating price fluctuations caused by occasional supply shortages on the market. Its gains and losses were held to be ordinary because the property it was using as a hedge--corn--was an integral part of its business. Hence, the taxpayer's trades in corn futures were taxed in the same manner as the corn that it held as inventory. Accordingly, the Supreme Court's focus in Corn Products was on the purpose for which the futures *616 were held--as a hedge--not on whether the underlying asset was capital or ordinary. In addition, in the cases cited by petitioners, the focus was also on the purpose for which the futures were held. See e.g., Meade v. Commissioner,T.C. Memo. 1973-46; Gee v. Commissioner,T.C. Memo. 1964-162. Moreover, from the time that courts began to scrutinize futures contracts, the focus has always been on determining the purpose for which the futures contracts were traded. In United States v. New York Coffee and Sugar Exchange, Inc.,263 U.S. 611 (1924), the Supreme Court categorized futures traders into three classes: first, those who use them to hedge, i.e., to insure themselves against loss by unfavorable changes in price at the time of actual delivery of what they have to sell or buy in their business; second, legitimate capitalists who, exercising their judgment as to the conditions, purchase or sell for future delivery with a view to profit based on the law of supply and demand; and, third, gamblers or irresponsible speculators who buy *617 or sell upon the turn of a card. [263 U.S. at 619.] This categorization has since been utilized by courts in determining the tax treatment of futures traders. See e.g., Corn Products Refining Co. v. Commissioner,350 U.S. 46, 50 (1955); Muldrow v. Commissioner,38 T.C. 907, 912 (1962). We recognize, as petitioners have pointed out, that our decision may be viewed as indirectly supporting respondent's Rev. Rul. 78-414, 1978-2 C.B. 213, which, in effect, allows a taxpayer to elect between capital gain or ordinary loss treatment by either choosing to offset a futures contract and receive a capital gain, or to accept delivery of the Treasury bill and receive an ordinary loss. Congress recognized this difference in treatment of Treasury bill futures and Treasury bills themselves and changed it in 1981 with the repeal of section 1221(5) in ERTA. However, this change in the statute does not affect our disposition of petitioners' case because we must apply the law that was applicable when the positions herein occurred. Accordingly, we hold that petitioners' losses incurred in the speculative trading of Treasury *618 bill futures are deductible only as capital losses. Decision will be entered for the respondent.
Footnotes
1. All rule references are to the Tax Court Rules of Practice and Procedure.↩
2. All section references are to the Internal Revenue Code, as amended and in effect during the years in question.↩
3. Petitioner's positions could still qualify for ordinary loss treatment if they met one of the judicially created exceptions to capital asset treatment, as either: (1) a bona fide hedging transaction in commodity futures, see Muldrow v. Commissioner,38 T.C. 907 (1962); or (2) an integral part of the taxpayer's day-to-day business operations, see Corn Products Refining Co. v. Commissioner,350 U.S. 46 (1955). However, as noted previously, the parties have stipulated that petitioner neither traded in Treasury bill futures as a hedge, nor did he hold the futures for sale in the ordinary course of his business. Accordingly, petitioner's trading in Treasury bill futures does not qualify under either of the aforementioned exceptions. Even if we were to consider the instant case in regard to Corn Products,↩ it is clear that petitioner was not trading in futures that were an integral part of his business.
4. See discussion in Garber, "New Tax Developments," 35 Bus. Law 871, 878 (March 1980); Kane, "Tax Treatment of Treasury Bill Futures," 52 S. Cal. L. Rev. 1555, 1557 (1979). Cf. Martin, "How T-Bill Spreads Can Be Used for Hedging and Tax Deferral Opportunities," 48 J. Tax 102↩ (1978).
5. Trading in Treasury bill futures is a recent phenomenon beginning around 1975. See Kane, "Tax Treatment of Treasury Bill Futures," 52 S. Cal. L. Rev. 1555↩ (1979).