Don D. DIAL; Elizabeth A. Dial,
Petitioners–Appellants,

v.

COMMISSIONER INTERNAL
REVENUE SERVICE,
Respondent–Appellee.

No. 90–70231.

United States Court of Appeals,
Ninth Circuit.

Submitted June 1, 1992.[*]

Decided June 30, 1992.

trict court will address on remand. *See Kelly,*
841 F.2d at 911.

* Oral argument was waived by appellant.

Don D. Dial, Elizabeth A. Dial, in pro per.

Doris D. Coles, Tax Div., U.S. Dept. of Justice, Washington, D.C., for respondent-appellee.

Before: WRIGHT, CANBY, and WIGGINS, Circuit Judges.

CANBY, Circuit Judge.

Don Dial[1] appeals a summary judgment of the Tax Court finding deficiencies in his federal income taxes for 1977, 1978, and 1979. We affirm.

## BACKGROUND

During the years in question, Dial traded in Treasury bill futures contracts for his own account. As the Tax Court explained, Treasury bills are short-term debt obligations of the United States that are sold at a price discounted below face value. The return to a holder of a Treasury bill is the difference between the discounted price and the face value at maturity. As the interest rate varies, prices at which Treasury bills are sold also vary.

Dial did not deal directly in Treasury bills. He dealt in futures contracts that treated Treasury bills as the underlying commodity.

> Commodity futures contracts are executory contracts representing a commitment to deliver or receive a specified quantity and grade of a commodity during a specified future month at a designated price.... The parties to a futures contract are the buyer, who is said to take a 'long' position, and the seller, who takes a 'short' position. The buyer is obligated to accept delivery of, and the seller is obligated to deliver, the quantity and grade of commodity at the time specified by the futures contract. A futures contract is satisfied only by performance or offset. An offset occurs when a trader takes a position equivalent, but opposite, to an earlier position. That is, a seller would offset a short position by taking a long position for the identical commodity for the same number of contracts in the same delivery month.... Only a small percentage of futures contracts are performed, since, unlike the underlying commodity, they cannot be disposed of in a secondary market.

*Moody v. Commissioner,* 49 T.C.M. (CCH) 514, 515 (1985). Thus, when Dial purchased a Treasury bill futures contract, he obtained the right to receive delivery of a certain quantity and type of Treasury bills on a specific date. When Dial sold a Treasury bill futures contract, he obligated himself to deliver a certain quantity and type of Treasury bills on a specific date. The parties agree that Dial dealt only in futures; he always satisfied his contracts by offset, and never sold, bought, or possessed Treasury bills.

Dial sustained losses of $34,175, $511,850, and $214,331 during tax years 1977, 1978, and 1979, respectively, on his sales and purchases of Treasury bill futures contracts. Dial claimed each of these losses as "ordinary losses" and, accordingly, deducted them from his taxable income for 1977, 1978, and 1979. The Commissioner disallowed Dial's claimed losses after determining that the Treasury bill futures contracts were "capital assets" within the meaning of 26 U.S.C. § 1221.[2] This determination required treating the losses as capital loss-

---

1. Elizabeth Dial is also a party to this matter because she filed joint returns with Don Dial.

2. Section 1221 defines a "capital asset" as "property held by the taxpayer." As it read in 1977 through 1979, subsection 1221(5) excluded from the definition of "capital assets" any "obligation of the United States or any of its possessions ... issued ... on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue." This exception was repealed by the Economic Recovery Tax Act of 1981, Pub.L. No. 97–34, § 505(a), 95 Stat. 331.

es, which cannot be deducted in full from ordinary income. The Commissioner assessed deficiencies of $8,660 for 1977, $228,788 for 1978, and $129,007 for 1979.

Dial filed a petition for redetermination in the Tax Court. The Commissioner moved for summary judgment. Five days before the hearing in Washington, D.C., Dial, who is representing himself, filed a "motion for dismissal of summary judgment"[3] requesting cancellation of the hearing in Washington, D.C., and seeking a trial in Seattle, Washington. The "motion" also stated: "This constitutes official notice in the above entitled case that a Motion for Summary Judgment is not warranted and that petitioner expects to present a line of facts and reasoning such as to overturn the applicability of *Moody v. Commissioner,* T.C. Memo 1985–20 to petitioner's case; and that, therefore, these losses are *not* capital as a matter of law."

The Tax Court issued an order on the day of the hearing permitting Dial to respond in writing to the Commissioner's summary judgment motion. Dial filed a memorandum in opposition. The Tax Court granted summary judgment to the Commissioner, relying on its decision in *Moody v. Commissioner,* 49 T.C.M. (CCH) 514 (1985). As in *Moody,* the court concluded that, although section 1221(5) at the time in question excepted Treasury bills from the definition of "capital assets," Treasury bill futures contracts were a different type of asset and did not fit within any of the narrowly drawn exceptions to the broad definition of "capital asset" set forth in section 1221. Thus, Dial's losses were capital losses rather than ordinary losses. *Dial v. CIR,* 58 T.C.M. (CCH) 1138 (1990).

Dial wrote two letters to the Tax Court to determine whether the court had considered his opposition to the Commissioner's summary judgment motion before issuing its decision. The court interpreted the letters as a motion to vacate and a motion

to reconsider. After determining that it had not considered Dial's opposition, the court granted the motion to vacate. On reconsideration, the court rejected Dial's argument that the futures contracts were "hedges" excepted from the definition of "capital assets":

> [A]cquisition of a futures contract is a hedge only if the transaction is undertaken *to offset a risk involving the underlying commodity,* not another futures contract. Although petitioner argues that not all of his trades involved offsetting contracts, the fact remains that he was not a broker or dealer in dollars, the "commodity" fluctuations in the value of which he was ostensibly protecting against by engaging in hedging transactions. Thus, his trades in Treasury bill futures contracts were not hedging transactions and do not qualify for ordinary loss treatment.

*Order and Decision,* No. 44906–86, slip op. at 2 (T.C. Feb. 16, 1990) (emphasis added). Dial again moved to vacate the court's order granting summary judgment. The court denied the motion.

Dial now appeals, challenging the Tax Court's substantive decision regarding section 1221 and "hedging transactions," as well as several of its procedural rulings.

## DISCUSSION

■ We review de novo the Tax Court's grant of summary judgment to the Commissioner. *Guaranty National Insurance Co. v. Gates,* 916 F.2d 508, 511 (9th Cir. 1990).

*Capital Assets Treatment for Futures Contracts*

■ Section 1221 defines "capital asset" as "property held by the taxpayer (whether or not connected with his trade or business)," and lists five specific exceptions. Dial first argues that, even if his futures

---

**3.** The Tax Court considered the "motion" as a Rule 50(c) statement. Tax Court Rule 50(c) states: "If a motion is noticed for hearing, a party to the motion may, prior to or at the time for such hearing, submit a written statement of

his position together with any supporting documents. Such statement may be submitted in lieu of or in addition to attendance at the hearing."

contracts do not fall within the enumerated exceptions, they are entitled to be treated as noncapital assets under the "hedging" exception recognized in *Corn Products Co. v. Commissioner*, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955). Corn Products manufactured a variety of products from grain corn (*e.g.*, starch, syrup, sugar). Having limited storage capacity and fearing an increase in the price of corn, Corn Products bought corn futures and thereby guaranteed an adequate supply of raw materials at specified prices. *Id.* at 48, 76 S.Ct. at 22. Because Corn Product's profits from its futures transactions far exceeded its losses, it sought a ruling that its futures contracts were capital assets under 26 U.S.C. § 117, the predecessor to section 1221. *Id.* at 49, 76 S.Ct. at 22. Recognizing that "hedges," as defined in *United States v. New York Coffee & Sugar Exchange, Inc.*, 263 U.S. 611, 619, 44 S.Ct. 225, 227, 68 L.Ed. 475 (1924),[4] had long been treated administratively as noncapital transactions,[5] Corn Products offered two arguments. First, it argued that its transactions were not true hedges because they did not protect against loss from a position already taken in a commodity. Second, they argued that the statute listed no exception for hedges, and the statutory exceptions must be deemed exclusive.

The Supreme Court recognized that Corn Products' transactions were not complete hedges, and that they did not fall within the "literal language" of the enumerated exceptions. *Id.*, 350 U.S. at 51, 76 S.Ct. at 24. The Court held, however, that the transactions involved "everyday operation of a business," *id.* at 52, 76 S.Ct. at 24, that Congress intended to subject to ordinary gain or loss treatment. The Court agreed with administrative interpretations that viewed "hedging transactions as insurance rather than dealing in capital assets." *Id.* at 52–53, 76 S.Ct. at 24.

■ Relying · on *Corn Products'* broad language, Dial argues that any futures transaction undertaken for a "business purpose" rather than an "investment motive" should be regarded as a hedge leading to ordinary income or loss. In response, we note first that the Supreme Court rejected this broad reading of *Corn Products* in *Arkansas Best Corp. v. Commissioner*, 485 U.S. 212, 219–23, 108 S.Ct. 971, 975–78, 99 L.Ed.2d 183 (1988).

> Section 1221 provides that 'capital asset' means property held by the taxpayer[,] ... but does not include the five classes of property listed as exceptions. *We believe this locution signifies that the listed exceptions are exclusive.* The body of § 1221 establishes a general definition of the term 'capital asset,' and the phrase 'does not include' takes out of that broad definition only the classes of property that are specifically mentioned.

*Id.* at 217–18, 108 S.Ct. at 975 (emphasis added). *Arkansas Best* then characterized the holding in *Corn Products* as an application of the inventory exception contained in subsection 1221(1). *Id.* at 220–22, 108 S.Ct. at 976–77. Only futures contracts guaranteeing or requiring delivery of the taxpayer's stock in trade or other property properly included in the taxpayer's inventory may be excepted from capital-asset treatment under *Arkansas Best.* Business purpose is not relevant to the determination whether property is a capital asset. *Id.* at 221–22, 108 S.Ct. at 976–77; *see also Azar Nut Co. v. Commissioner*, 931 F.2d 314, 317 (5th Cir.1991) (explaining *Arkansas Best); accord Swartz v. Commissioner*, 876 F.2d 657, 659 (8th Cir.1989) (business motive is irrelevant after *Arkansas*

---

**4.** "Those who deal in 'futures' are divided into three classes: first, those who use them to hedge, i.e. to insure themselves against loss by unfavorable changes in price at the time of actual delivery of what they have to sell or buy in their business; second, legitimate capitalists who, exercising their judgment as to the conditions, purchase or sell for future delivery with a view to profit based on the law of supply and demand; and third, gamblers or irresponsible speculators who buy or sell as upon the turn of

a card." *New York Coffee,* 263 U.S. at 619, 44 S.Ct. at 227.

**5.** The exception for "hedging transactions" was originally an administrative and judicial creation; however, Congress subsequently provided explicit exceptions from capital gain or loss treatment for hedging transactions in 26 U.S.C. § 1233(g) and 26 U.S.C. § 1256(e).

*Best),* cert. denied, 494 U.S. 1006, 110 S.Ct. 1301, 108 L.Ed.2d 478 (1990).

Dial argues that the adoption of a narrow view of "hedges" is unfairly retroactive, because he acted in reliance on the broader standard that he derives from *Corn Products.* There are formidable problems with Dial's arguments against retroactivity. Because the *Arkansas Best* Court applied the narrower view of hedges retroactively to the taxpayer in that case, it follows that its rule would apply retroactively here. *See James B. Beam Distilling Co. v. Georgia,* — U.S. —, 111 S.Ct. 2439, 2446, 115 L.Ed.2d 481 (1991) ("[T]he question is whether it is error to refuse to apply a rule of federal law retroactively after the case announcing the rule has already done so. We hold that it is").

We need not depend on retroactivity here, however. It makes little difference in Dial's case whether a broad or narrow view is taken of the hedging exception. His transactions would not qualify for ordinary loss treatment even under an expansive reading of *Corn Products.* Dial did not deal in futures contracts to assure himself a supply of raw materials necessary to the functioning of his business. *See, e.g., Agway, Inc. v. United States,* 524 F.2d 1194, 1200–02, 207 Ct.Cl. 682 (1975); *Booth Newspapers, Inc. v. United States,* 303 F.2d 916, 920–22, 157 Ct.Cl. 886 (1962) (and cases cited therein); *Mansfield Journal Co. v. Commissioner,* 274 F.2d 284, 286 (6th Cir.1960); *see also Hollywood Baseball Association v. Commissioner,* 423 F.2d 494, 500–03 (9th Cir.), cert. denied, 400 U.S. 848, 91 S.Ct. 35, 27 L.Ed.2d 85 (1970). Nor did he buy into his futures contracts to protect himself against market fluctuations in the price of a commodity integral to his ordinary business. *See, e.g., Wool Distributing Corp. v. Commissioner,* 34 T.C. 323, 331–33 (1960). On the contrary, he purchased or sold his contracts primarily for the purpose of making profits from the trading. The contracts accordingly were capital assets even under a broad reading of *Corn Products. See,*

e.g., *Day v. U.S.,* 734 F.2d 375, 376–77 (8th Cir.1984); *United States v. Rogers,* 286 F.2d 277, 280–82 (6th Cir.), cert. denied, 366 U.S. 951, 81 S.Ct. 1902, 6 L.Ed.2d 1243 (1961); *see also Faroll v. Jarecki,* 231 F.2d 281, 288 (7th Cir.), cert. denied, 352 U.S. 830, 77 S.Ct. 45, 1 L.Ed.2d 51 (1956). Dial's argument based on *Corn Products* and its progeny therefore fails.

■ As an alternative, Dial suggests that Treasury bill futures should be included in a broad reading of former section 1221(5), the exception from capital-asset treatment for any "obligation of the United States." That exception was repealed by the Economic Recovery Tax Act of 1981, Pub.L. No. 97–34, Sec. 505(a), 95 Stat. 331, but it was in effect during the tax years in dispute here. Dial's argument is similar to that raised by the taxpayer in *Moody v. Commissioner,* 49 T.C.M. (CCH) 514 (1985). The Tax Court responded to that contention as follows: "Section 1221(5) deals with Treasury bills—the asset itself—and not with Treasury bill futures. When an investor purchases a Treasury bill future, he is trading in contracts, not in the underlying asset." *Id.* The court also found no indication in the legislative history that Congress intended to except futures contracts along with Treasury bills from the definition of "capital assets." *Id.* at 516. We agree with the Tax Court's interpretation of former section 1221(5).

Dial argues that the 1981 repeal of the Treasury bill exception previously embodied in section 1221(5) supports his position that his futures transactions caused ordinary loss. He points out that Congress repealed the former section 1221(5) to eliminate ordinary loss treatment arising from "tax straddles" involving Treasury bill futures contracts,[6] and that the repeal indicates that Congress believed that such treatment was permissible before 1981. The problem with Dial's argument is that his transactions did not constitute the kind of "tax straddle" that Congress was targeting when it repealed the exception for Treasury bills. The tax shelter that Con-

---

**6.** Capital gains treatment for post–1981 futures transactions is now governed by section 1256(a), with the exception provided by subsection 1256(e) for hedging transactions.

gress was attempting to eliminate occurred when a taxpayer holding offsetting Treasury bill futures contracts would take delivery of the Treasury bill on the loss contract, and would sell the underlying bill and take an ordinary loss. The taxpayer would then, usually in the following year, sell the gain futures contract, taking a short-term capital gain. *See* S.Rep. 144, 97th Cong. 1st Sess. 165–67, *reprinted in* 2 1981 U.S.Code Cong. & Admin.News 105, 262–64. Even if we assume, without deciding, that such tax straddles were permissible before 1981, Dial did not engage in this type of transaction. He never took delivery of a Treasury bill and sold it at a loss. Yet it is the Treasury bill itself, as an obligation of the United States, that was excepted from the definition of capital asset by former section 1221(5). Dial bought and sold only Treasury bill futures, and they met section 1221's definition of capital assets without qualifying for any of the exceptions to that definition.

We conclude, therefore, that the district court did not err in deciding that Dial's losses from futures transactions in Treasury bills created capital losses.

*Dial's Statutory and Constitutional Procedural Contentions*

Dial argues that the IRS and the Tax Court made a number of procedural errors while disposing of this case. We address them individually.

### A. *Commissioner's Failure to Notify Dial of Trial Location*

■ Dial claims that the Commissioner failed to notify him of a change in the hearing location from Albuquerque, New Mexico to Seattle, Washington. This claim is frivolous. Even if the Commissioner has such a duty, the Tax Court disposed of the case by summary judgment. Dial was not prejudiced by any failure on the part of the Commissioner to notify him of the hearing location. Further, Dial admits that he re-

ceived notice from the Tax Court that the hearing would be held in Seattle.

Dial may be referring to the Washington, D.C. hearing on the Commissioner's summary judgment motion. Tax Court Rule 50(b)(2) indicates that summary judgment motion hearings "normally will be held in Washington, D.C." Dial did not request that the hearing be relocated and he was given an opportunity to oppose the summary judgment motion in writing.

### B. *Commissioner's Failure to Consult with Dial*

■ Dial asserts that the Commissioner violated Tax Court Rule 70(a) by failing to "consult and communicate" with him prior to filing for summary judgment. This claim is also meritless. Rule 70(a) deals exclusively with discovery: "the Court expects the parties to attempt to attain the *objectives of discovery* through informal consultation or communication before utilizing the discovery procedures provided in these Rules." (Emphasis added). The Commissioner points out that he never engaged in discovery. Rule 70(a) did not apply here.

### C. *Tax Court Treating Letters as Motions and then Denying Dial's Subsequent Motion to Vacate*

■ Dial complains that the Tax Court treated two of his letters as a motion to vacate and a motion for reconsideration. The court gave a liberal interpretation to these letters in recognition of Dial's status as a *pro se* litigant, *see Eldridge v. Block*, 832 F.2d 1132, 1137 (9th Cir.1987), and clearly did so to Dial's benefit. The court granted the motion to vacate to permit consideration of Dial's opposition to the Commissioner's motion for summary judgment.[7] The court then considered Dial's arguments and modified its opinion to reflect that consideration and provide a response.

---

7. Dial also complains of the Tax Court's initial failure to consider his response to the motion for summary judgment. Because the Tax Court acknowledged its failure to consider Dial's op-

position to the Commissioner's motion for summary judgment and remedied its error by granting Dial's motion to vacate, this claim is frivolous.

Dial also asserts that the Tax Court erred by denying his subsequent motion to vacate. Although this motion was more extensive than Dial's memorandum in opposition to summary judgment, it did nothing more than restate Dial's arguments at greater length. The Tax Court considered and addressed each argument raised in the motion. The Tax Court acted within its discretion in denying Dial's second motion to vacate.

### D. *Laches*

■ Dial contends that the Commissioner and the Tax Court unfairly delayed disposition of his case. He has not shown, however, any reason why the delay should be cause for reversal. No statute of limitation was violated, and laches is not a defense to the United States' enforcement of tax claims. *United States v. First National Bank of Circle*, 652 F.2d 882, 890 (9th Cir.1981).

### E. *IRS's Failure to Serve Dial with Summary Judgment Motion*

■ Dial asserted in his opening brief that he did not receive a copy of the Commissioner's motion for summary judgment until three years after its filing. Dial conceded in his reply brief, however, that he received the Commissioner's Memorandum of Law in Support of Respondent's Motion for Summary Judgment before preparing and filing his opposition to the Commissioner's summary judgment motion. Any error in failing to serve Dial with the actual motion was harmless. Tax Court Rule 160.

In sum, we conclude that Dial's procedural rights were not violated.

### CONCLUSION

The judgment of the Tax Court is AFFIRMED.