FEDERAL NATIONAL MORTGAGE ASSOCIATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 21557–86.                    Filed June 17, 1993.

Felix B. Laughlin, Joseph Angland, and David C. Garlock, for petitioner.*

Theodore J. Kletnick, Patricia A. Donahue, Michelle A. Missry, Bruce M. Wilpon, Elizabeth A. Maresca, and Diane P. Thaler, for respondent.

---

*Briefs amici curiae were filed by Bradford L. Ferguson and Michael A. Clark as attorneys for the Chicago Board of Trade and Chicago Mercantile Exchange, and Robert A. Rudnick and Stephen N. Shulman as attorneys for the Federal Home Loan Mortgage Corp.

KÖRNER, *Judge:* On April 7, 1986, respondent issued a statutory notice of deficiency to petitioner with respect to the taxable years 1971, 1973, 1974, 1975, 1977, and 1979 in which respondent determined, inter alia, deficiencies in petitioner's corporate income tax in the amounts of $81,735,007 and $50,237,039 for taxable years 1974 and 1975, respectively.

Federal National Mortgage Association (hereinafter FNMA or petitioner) filed two petitions with this Court on June 20, 1986: (1) Docket No. 21556–86 seeking a redetermination of deficiencies determined for 1971, 1973, 1977, and 1979 relating to net operating loss carrybacks to those years from 1980, 1981, and 1982, and relating also to other issues applicable only to 1979; and (2) this case seeking a redetermination of deficiencies determined for 1974 and 1975 relating to net operating loss carrybacks to those years from 1982 and 1984.

On March 14, 1988, this Court rendered its opinion in docket No. 21556–86 after a trial of the unresolved issues in that case, and the decision has since become final. *FNMA v. Commissioner,* 90 T.C. 405 (1988), affd. 896 F.2d 580 (D.C. Cir. 1990).

On October 10, 1991, respondent made an assessment of tax with respect to petitioner's taxable year 1975 of $20,361,686, resulting from a reduction of the net operating loss carryback from 1985 arising from respondent's disallowance of: (1) The claimed losses from foreign currency swap transactions in the net amount of $31,181,296; and (2) an additional claimed loss from hedging transactions[1] in the amount of $15,467,270, which hedging loss had been included in petitioner's interest expense deduction.

---

[1] When used in this opinion, hedging refers to various transactions, involving short sales or futures positions, undertaken by FNMA to reduce interest rate risk arising from its issuance of debentures or from agreements to acquire mortgages, thereby assuring petitioner of a certain future interest cost or mortgage yield.

On November 18, 1991, petitioner filed an amended petition in this case placing in issue the carryback to 1975 of the 1985 net operating loss arising from the hedging transactions and the net loss from foreign currency swap transactions.

As a result of this Court's opinion in FNMA I, the issue in this case with respect to the 1982 net operating loss carryback to 1974 has been resolved. The issues that remain for this case relate to the net operating losses carried back from 1984 and 1985 to 1974 and 1975, resulting from the hedging transactions and the foreign currency swap transactions. All other issues relating to the net operating loss carrybacks from 1984 and 1985 have been settled by the parties.

Specifically, the unresolved issues for decision are: (1) Whether respondent erred in determining that the sale and exchange of regulated futures contracts on debt securities, options on such regulated futures contracts, and Treasury securities by petitioner in 1984 and 1985 gave rise to capital gains and losses; (2) whether respondent erred in determining that petitioner had not properly calculated its gains and losses on certain transactions involving the short sale of Treasury securities and put options on regulated futures contracts; and (3) whether respondent erred in determining that the disposition of Japanese yen in 1985 pursuant to certain yen swap agreements resulted in no gains and losses because: (a) The entire transactions should be integrated until their conclusion in later years; or (b) the claimed losses were a sham.

All statutory references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

## FINDINGS OF FACT

Some of the facts in this case are stipulated and are so found. The stipulations of facts and their accompanying exhibits are incorporated by this reference.

FNMA is a private corporation organized under the National Housing Act (the Act), ch. 847, tit. III, sec. 301 (1934), 48 Stat. 1252, 12 U.S.C. secs. 1716-1723 (1988) (as amended), and has its principal office in Washington, D.C. Petitioner,

for the years at issue, filed its returns on the basis of the calendar year and used the accrual method of accounting. At all times relevant to this case, the stock of petitioner has been continuously listed and sold on the New York, Pacific Coast, and Midwest stock exchanges.

FNMA's purpose in 1984 and 1985 under the Act was "to provide supplementary assistance to the secondary market for home mortgages by providing a degree of liquidity for mortgage investments, thereby improving the distribution of investment capital available for home mortgage financing." Housing Act of 1954, ch. 649, tit. II, sec. 201, 68 Stat. 612, 12 U.S.C. sec. 1716(a). The secondary mortgage market refers to the group of institutions and individuals that trade existing mortgages and mortgage-related securities.

In fulfilling this purpose, FNMA purchased residential mortgages from mortgage lenders for its "mortgage portfolio".[2] Its net portfolio balance was $84.6 and $95.0 billion at the end of 1984 and 1985, respectively. It was the largest owner of mortgages in the United States during those years.

FNMA, on its 1984 and 1985 financial statements, characterized the mortgage portfolio as a long-term investment in accordance with what it considered generally accepted accounting principles, and reported to the Commodity Futures Trading Commission that its principal business was "mortgage investment".

Earlier in 1977, petitioner and respondent in a closing agreement agreed, among other things, that any sale or exchange of mortgages by petitioner would generate ordinary income or loss. The relevant provision read:

Gain or loss from sales of mortgages by taxpayer during taxable year 1971 * * * and all subsequent taxable years or periods shall be taxed as ordinary income or loss and shall not be entitled or subject to capital gain or loss treatment under Section 1221 of the Internal Revenue Code.

In order to finance the purchase of mortgages, FNMA borrowed money from the public. FNMA issued debt in the amounts of $47.971 billion and $48.284 billion in 1984 and 1985. These funds were used both for the purchase of mort-

---

[2] The references to purchase and sales of mortgages appear to be universally accepted parlance in the financial world, and are accepted and used here. It must be understood, however, that what petitioner was doing was buying the promissory note which the mortgage secured. Petitioner was a secondary lender of money, using its money to replace the loan originally made to the mortgagor by another lender, and thereby becoming the lender.

gages and to refund maturing obligations. At the end of 1984 and 1985, petitioner's outstanding debt was $83.7 billion and $93.9 billion, respectively.

The principal factor in determining the profit or loss of FNMA was the spread between the average net yield on its mortgage portfolio and the average cost of its outstanding debt. During the early eighties, most of the mortgages it held were long-term, fixed rate mortgages with low interest rates. Petitioner's debt was relatively short term in comparison to the maturity of its mortgages. When interest rates rose significantly in the early eighties, the mismatch in petitioner's rate of return on its portfolio and its cost of debt caused it to sustain substantial economic losses. For the full year 1984, the average portfolio yield was 10.81 percent, and the average cost of outstanding debt was 11.39 percent. For 1985, the average portfolio yield was 10.92 percent and the average cost of outstanding debt was 11.14 percent.

For financial reporting purposes, FNMA reported net interest margin losses[3] on its portfolio in the following amounts:

| Year | Amount of loss |
|---|---|
| 1981 | $463 million |
| 1982 | 506 million |
| 1983 | 62 million |
| 1984 | 152 million |

In 1985, petitioner reported net interest margin gain in the amount of $71 million.

The manner in which FNMA conducted its business subjected it to the risk that interest rates would rise on the money petitioner had to borrow (interest rate risk). This risk arose in part because the duration[4] of FNMA's portfolio exceeded that of its liabilities. Thus, FNMA faced the risk that its spread would erode when it refunded its debt in carrying its low yield long-term mortgages.[5] Furthermore, since the purchase price of the mortgages FNMA acquired was set in advance of settlement, petitioner ran the risk that if interest

---

[3] Net interest margin gains and losses represent the return on mortgage portfolio and marketable securities owned, less the cost of debt.

[4] Duration is defined as a measure of the weighted average life of an investment.

[5] Petitioner refers to this as refinancing risk.

rates were to rise, the present value of the acquired mortgages would have declined[6] and the debt petitioner incurred to finance the acquisition of these mortgages would have been more costly.

During the early eighties, FNMA employed several techniques to reduce its interest rate risk. FNMA, prior to and including 1984 and 1985, attempted to close the gap between the duration of its mortgages and liabilities by purchasing adjustable rate mortgages and lengthening the maturity of its debentures.

The duration of its mortgages exceeded the maturity of its debt for 1982 through 1985, as follows:

*Duration Months*

| Year end | Mortgage assets | Liabilities funding mortgages | Duration gap |
|---|---|---|---|
| 1982 | 55 | 21 | 34 |
| 1983 | 54 | 22 | 32 |
| 1984 | 52 | 23 | 29 |
| 1985 | 49 | 30 | 19 |

In FNMA's case, however, the equalizing of the duration of its assets and liabilities would have resulted in significant losses, since most of its assets comprised older fixed rate mortgages earning a relatively low return, while its liabilities carried the higher rates present in the early eighties.

In addition to attempting to reduce its interest rate risk by shortening its duration gap, petitioner also began to demand delivery of mortgages upon settlement of the commitments, issued mortgage backed securities,[7] and instituted a program of minimizing or guarding against the interest risks in the issuance of its debentures and its mortgage commitments.[8]

At the same time that FNMA reduced the duration gap between its mortgages and liabilities, it also was purchasing

---

[6] This is referred to as commitment risk. Commitment risk could be eliminated if petitioner had the funds available at the time of commitment to acquire the mortgages. However, petitioner was limited as to the dates it could issue debt, and at the time of commitment the demand for bonds may have been soft.

[7] These securities were issued by FNMA, were backed by pools of mortgages held by FNMA, were guaranteed by FNMA, and paid investors the interest and principal from the underlying mortgages net of servicing and guaranty fees. This program was unrelated to the hedging transactions at issue in this case, although it served to reduce FNMA's interest rate risk.

[8] This term describes the transactions in which petitioner engaged, described *infra* sec. I.A of our findings.

high-yielding mortgages and financing these with short-term debt, in order to generate income to offset the large losses in its older portfolio. In 1984 and 1985, the growth of petitioner's overall portfolio was a significant goal of its management. The size of FNMA's overall portfolio grew from the end of 1981 to June 30, 1984, from $60 billion to $83.5 billion.

Despite FNMA's program to reduce interest rate risk, such risk was greater on December 31, 1985, than it was on January 1, 1984.

Petitioner sold mortgages in its portfolio amounting to approximately $1.03 billion and $1.3 billion in 1984 and 1985, respectively.

For 1984, petitioner reported on Form 1120 a net operating loss of $261,902,273. In determining the amount of loss, petitioner identified on Schedule M of that return a net loss of $53,158,812 as attributable to hedging transactions. This amount comprised a loss from debenture hedging transactions, a loss from Alaskan Housing Finance Corp. (AHFC) commitment hedging transactions,[9] and a gain derived from the net of commitment fees from convertible commitments and losses on the options used in convertible commitment hedging transactions[10] in the amounts of $31,744,000, $21,965,000, and $552,000, respectively.

For 1985, petitioner reported on Form 1120 a net operating loss of $78,218,187, which included a net loss of $70,504,419 from transactions identified on Schedule M as from hedging, and a net loss of $31,181,296 identified on Schedule M as arising from the forward sales of borrowed foreign currency.[11] Its 1985 hedging loss comprised the following: A $53,103,401 loss from debenture hedging;[12] a $17,963,094 loss on AHFC commitment hedging; and a $562,076 gain on convertible commitment hedging.

Petitioner consistently reported its gains and losses from hedging transactions as ordinary income or deductions on its Forms 1120 for all years from 1982 to the present. Petitioner identified (under the requirements of section 1256(e)(2)(C))

[9] See *infra* sec. I.C of our findings.

[10] See *infra* sec. I.D of our findings.

[11] See *infra* sec. III of our findings.

[12] Included in this amount was an interest expense of $1,713,121 connected with the short sales of Treasury securities that were not closed out until 1986.

all of its futures, options, and short sales of Treasury securities as hedging transactions.

FNMA's net operating loss for 1984 was carried back on Form 1139 filed on February 22, 1985, and taken by petitioner, in part, as a $157,241,775 net operating loss deduction in 1974. The remaining portion of the 1984 net operating loss was also carried back on the Form 1139 filed on February 22, 1985, and taken by petitioner as a $104,660,498 net operating loss deduction in 1975. FNMA's net operating loss for 1985 was carried back in part on Form 1139 filed on July 28, 1986, and taken by petitioner as a $64,037,267 net operating loss deduction in 1975.

On April 15, 1985, respondent issued refunds based upon FNMA's carryback of its reported net operating loss for 1984 in the amounts of $75,418,464 and $50,237,039 for 1974 and 1975, respectively. Respondent also issued a refund on August 28, 1986, in the amount of $29,396,901.21 for 1975 based upon the carryback from 1985.

## I. *The Hedge*

### A. *Overview*

In 1982, FNMA's board of directors authorized a hedging program, and petitioner's reported losses from hedging for 1984 and 1985 arose from transactions undertaken as part of this program. FNMA's Assets & Liabilities Committee (A&L Committee) was responsible, inter alia, for coordinating interest-rate-sensitive decisions, including whether to utilize hedging as a tool to manage interest rate risk. Petitioner's hedging program was managed, subject to the supervision of the A&L Committee, by the office of hedge management, subsequently called the office of risk management. It had discretion in determining the choice of hedge positions and the timing of placing and lifting of those hedges.

Some of the factors considered by the A&L Committee in determining whether or not to hedge a particular transaction included: (1) The need and ability to fund; (2) the absolute level of interest rates in place at the time the decision was required; (3) market view; (4) the cost of placing a hedge; (5) the quantity of outstanding commitments; and (6) the size of a given transaction.

The hedging transactions were of three types: (1) Hedges of anticipated issuances of debentures (debenture hedging); (2) hedges of commitments to purchase notes of the Alaska Housing Finance Corp. (AHFC hedging); and (3) hedges of convertible commitments (convertible commitment hedging).

Each hedge had a direct relationship to an anticipated debenture issuance or to debt issued to purchase mortgages that were subject to commitments, and was treated as a microhedge for financial accounting purposes.[13] The purpose of these hedges was to reduce the interest rate risk identified as relating to specific portions of debt or commitments. FNMA did not hedge the majority of its debenture issuances and mortgage commitments in 1984 and 1985.

For each hedge it authorized, the A&L Committee issued a hedge strategy memorandum (HSM). The HSM stated the purpose of the hedge and contained, among other things, a general description of the transaction to be hedged, the dollar amount to be hedged, the period during which the hedge would be required, and its structure. An HSM number would appear on each trading ticket involved in the hedge, so that it could be monitored.

The HSM's dealing with hedging debentures described the amount of the prospective debenture to be hedged, the type of vehicle to be utilized, and the target rate to be achieved. These HSM's also required that the hedges be carefully managed.

The HSM's relating to AHFC commitments authorized the placement of hedges to ensure that the effective asset yield of the notes remained at current market levels until the time of purchase, outlined the spot rate to be protected, and stated that the hedges were to be lifted upon the delivery of the notes.

The HSM's covering FNMA's convertible commitment program were issued to protect against the risk of purchasing below market mortgages if interest rates were to rise and lenders convert their commitments to mandatory delivery; in such circumstances, the participating lenders would exercise their option to require FNMA to purchase the mortgages cov-

---

[13] Microhedging involves hedging of specific liabilities, assets, or commitments. Microhedging reduces interest rate risk that would have existed had the specific hedge not been undertaken. Despite this type of hedging, FNMA's overall interest rate risk, as the result of its acquisition of additional mortgages, increased.

ered by the convertible commitment. The HSM's stated that the hedges were to offset this exposure, were to be lifted following expiration or conversion of the convertible commitments, were to use certain instruments, and were subject to review by the A&L Committee.

Almost all of petitioner's hedges placed during 1984 and 1985 involved either: (1) Short positions in futures contracts on debt securities and call options on such contracts;[14] (2) short sales of U.S. Treasury securities;[15] or (3) put options in futures contracts on Treasury securities.[16]

Petitioner incurred interest rate risk when it did not hedge its debentures prior to issuance and when it made unhedged commitments to acquire mortgages. The hedging transactions reduced but did not eliminate FNMA's interest rate risk upon certain specified transactions since "basis risk" remained. Basis risk is defined as the risk that the value of a hedge will not move exactly inversely to the value of the asset or liability being hedged. It arises from the imperfect match between the characteristics of the hedge vehicle and the item being hedged; thus, for example, for the same change in interest rate the value of the asset being hedged will fall more or less than the hedge vehicle.

FNMA did not quantify the extent to which its program of hedging actually reduced its overall interest rate risk during 1984 or 1985.

Petitioner reported the following gains and (losses) from its hedging transaction in 1984 and 1985:

|  | *1984* | *1985* |
|---|---|---|
| Debenture | ($31,745,315) | ($53,103,401) |
| AHFC | (21,965,387) | (17,963,094) |
| Convertible |  - - -  |  - - -  |
| Commitment | 551,890 | 562,076 |
|  | (53,158,812) | (70,504,419) |

## 1. *Futures Contract Short Positions*

This section describes how FNMA utilized short positions in interest rate futures contracts to hedge its interest rate risk

---

[14] Used in conjunction with debenture and Alaska Housing Finance Corp. mortgage hedging.
[15] Used in debenture hedging.
[16] Used in debenture and convertible commitment hedging.

with respect to particular debenture issuances or mortgage commitments.

An interest rate futures contract is an agreement to buy or sell a package of debt instruments, such as Treasury bonds, notes, or bills, at a specified future date at a price that is fixed today. The price of the contract is sensitive to changes in the market rate of interest. The gain or loss on a futures contract is computed by daily marking to market.

A short position in an interest rate futures contract is a commitment to sell bonds or bills at a fixed yield for delivery at a later date, which protects the seller against a rise in interest rates. If interest rates rise, the value of the bond futures contract will fall, and the contract would be terminated by taking an offsetting long position in the same contract. Ideally, FNMA's profit on the futures contract would offset its increased cost of borrowing.

Petitioner established short positions in interest rate futures contracts on the Chicago Board of Trade or the International Monetary Market Division of the Chicago Mercantile Exchange. Petitioner generally used a combination of short positions in two or more types of interest rate futures contracts since interest rate futures contracts were available only on debt instruments of certain maturities. A few days prior to the date the debt obligation being hedged was priced, petitioner would close out its short positions.

Petitioner incurred losses on these futures positions since interest rates fell during the last 6 months of 1984 and through mid-1985. The drop in interest rate, however, also allowed petitioner to issue its debentures at lower interest rates, offsetting the losses on the futures positions.

For Federal income tax purposes, FNMA computed its gains and losses on the hedging transactions involving interest rate futures contracts by marking to market on a daily basis, and the aggregate net gain or loss for the taxable year was taken into account in determining the loss from hedging transactions for that year.

## 2. *Treasury Securities Short Sales*

FNMA's use of short sales of Treasury securities (T-notes) to hedge debenture issuances took the following form. In this type of hedge, petitioner sold to a dealer an amount of T-notes at the current market price plus accrued interest. The

dealer in order to facilitate the sale lent the T-notes to FNMA. These notes were then sold by the dealer, who would keep the proceeds. FNMA would make payments in lieu of interest to the dealer for the loan of the T-notes, and the dealer would pay interest on the proceeds of the sale of those notes. On the date of the pricing of petitioner's debt obligation being hedged, the dealer would purchase in the market on petitioner's behalf the same dollar amount of the same T-notes that had been sold. After this transaction, the difference between the cost of the T-notes plus accrued carrying costs and the proceeds of the short sale was paid by the dealer to petitioner (or vice versa).

Petitioner computed its gain or loss on the short sales of Treasury securities as the net of: (1) The gain or loss on the Treasury principal; (2) the amounts in lieu of interest paid by petitioner during the period the short sale was open; and (3) the interest received by petitioner on the loan of the short sale proceeds. The computation could only be made when the transaction was completed.[17]

### 3. *Options*

Petitioner also utilized put options in its hedging program. A put option is a financial instrument that entitles the holder to sell a specified quantity and type of security or futures contract on or before the expiration date of the put option for a fixed price (referred to as the strike price). In contrast to a short position, the purchaser of a put option incurs a fixed up-front cost, which limits the losses if interest rates decline. The parties have stipulated that, for purposes of this case, put options on futures contracts on Treasury securities have the same economic consequences as put options on the underlying Treasury securities.

The gain or loss on an option was taken into account in the year in which the option was closed out through sale, exercise, or lapse. Petitioner computed its gain or loss as the difference between: (1) The commitment fees received plus any proceeds received from closing out its option positions; and (2) the sum of the amounts paid to enter into the options positions.

---

[17] See *infra* sec. II of our findings.

## B. *Debenture Hedging*

FNMA issued debentures, which were debt obligations with a typical term greater than 1 year but not exceeding 7 years, as part of its normal course of business. These provided FNMA with funds to finance its mortgage portfolio and the purchase of new mortgages. In 1984 and 1985, petitioner issued debentures on a monthly basis.

These debentures were priced in general approximately 5 business days in advance of the issuance of the obligations. Pricing the debenture obligated FNMA to sell for a fixed price a specified principal amount of debt obligations bearing a specified rate of interest.

The principal factors in determining the dollar amount of debentures petitioner planned to issue in each month included: (1) The dollar volume of mortgage purchase commitments petitioner had outstanding; (2) the extent to which existing debt needed to be refinanced; and (3) market supply and demand in the debt markets.

The A&L Committee authorized the use of hedging transactions in connection with part of the debenture issuances for the months of February 1984, July through December 1984, and June and July 1985. Only a portion of the debenture issuances authorized to be hedged was hedged. With respect to FNMA's debenture issuances for all other months in 1984 and 1985, no hedging transactions were authorized.

In 1984, petitioner issued debentures in the amount of $21.324 billion and hedged $3.556 billion of this amount (16.7 percent). In 1985, petitioner issued debentures in the amount of $23.59 billion and hedged the issuance of $2 billion in debt (8.5 percent). The hedges in question were placed when FNMA decided to issue particular debentures and remained in place until the debentures were actually issued. The period that the debenture hedges mentioned above were in place generally matched, but did not precisely match, the period between the decision to hedge and the issuance of the debenture being hedged and varied for 1984 and 1985 in length from approximately 1 to 4 months. This period of time between the decision to issue the debentures and their issuance exposed FNMA to the risk that interest rates would increase in the interim.

FNMA's hedging transactions directly served to lock in the interest rate cost associated with the debenture issuance being hedged. Debenture hedging on the part of petitioner did not protect the spread on petitioner's entire portfolio. Nonetheless, the effect was to reduce the interest rate risk of the entire portfolio, although minimally.

Except as described below, petitioner used short positions in interest rate futures contracts and/or short sales of Treasury obligations when hedging a part of an anticipated issuance of a debenture. The short futures positions and/or short sales petitioner used to effectuate a given hedge strategy were chosen so that, as nearly as possible, in the event of an increase (or decrease) in interest rates, the gain (or loss) on petitioner's short positions or short sales would offset in present value terms the increase (or decrease) in borrowing costs on the part of the planned debenture being hedged for the anticipated terms of the debenture.

Petitioner determined a target debt cost for each issuance. Following issuance of the debenture, FNMA computed its effective debt cost, which was equal to the interest rate that would be the debt cost of the debenture if the hedging gain (or loss) were treated as an increase (or decrease) in the proceeds from the sale of the obligation. If a hedge operated perfectly, the effective debt cost would equal the target debt cost.

As a result of the fall in interest rates during the last 6 months of 1984 and during the middle of 1985, FNMA incurred losses on the short futures positions and short sales used as debenture hedges. However, FNMA was able also to issue its debentures at lower interest rates than those prevailing at the time the short futures positions or short sales were established, offsetting the losses on the futures positions.

To hedge a part of its August 1984 debenture issuance, petitioner purchased put options on futures contracts on 30-year Treasury bonds. The put options were chosen so that, as nearly as possible, in the event of an increase in interest rates beyond a chosen target level, the gain on petitioner's put options would offset in present value terms the increase in borrowing costs on part of the planned debenture being hedged for the anticipated term of the debenture. Petitioner

did not use options to hedge any of its other debenture issuances.

Interest rates fell while the put options to hedge its August 1984 debentures were outstanding, so that most of the options were sold at a loss and the remaining options expired without value. FNMA had a loss on its options equal to the difference between the aggregate amount paid for the options and the aggregate amount received upon the sale of the unexpired options.

For 1984, petitioner claimed a loss of $15,362,283 from its debenture hedges utilizing regulated futures contracts. Petitioner reported for 1985 a loss in the amount of $174,029 arising from the disposition of regulated futures contracts used to hedge the issuance of certain debentures in 1986.

Petitioner claimed net losses on its short sales of Treasury securities relating to hedges on debentures issued in 1984 in the amount of $6,387,536; net losses on its short sales of Treasury securities relating to debentures issued in 1985 in the amount of $51,216,251; and net losses of $1,713,121 in 1985 on its short sales of Treasury securities relating to debentures issued in 1986. In 1984, petitioner utilized put options to hedge a portion of its debentures that were issued in August of that year. It claimed a loss of $9,995,496 in 1984 with respect to this hedge.

FNMA, for financial accounting purposes, spread the losses generated by the hedging transactions over the life of the hedged debentures.

## C. *Alaska Housing Finance Corp. Notes*

In 1984, petitioner entered into several commitments to purchase collateralized notes of the AHFC in the total amount of $300 million. The notes were secured by pools of mortgages, under which the timing and amounts of principal and interest payments were identical with the notes. AHFC had the option of delivering or not delivering the notes at anytime on or before September 1, 1985, but would incur a penalty for failure to do so. The commitments obligated FNMA to purchase the notes at a predetermined yield with delivery to occur at an uncertain future date.

The A&L Committee issued HSM's authorizing the use of interest rate futures contracts to hedge a portion of the commitments to purchase the AHFC notes. The practical effect

of the hedges was to turn the obligation to purchase the AHFC notes into a market rate standby commitment under which the purchaser is committed to buy the mortgages at the market yield existing at the time of purchase rather than at a price fixed in advance.

To hedge the AHFC mortgage commitments, petitioner used short positions in interest rate futures contracts and in call options on such contracts to hedge $175 million of its commitments to purchase AHFC notes. The remaining $125 million of the commitments to purchase AHFC notes went unhedged.

Petitioner's office of risk management originally planned its hedge strategy assuming that the AHFC notes would be delivered by September 1, 1984, which date was not met. The notes were not delivered by that date, and FNMA extended its hedged position by closing out existing short futures positions and replacing them with new short futures positions (which is referred to as rolling hedges). As the notes were delivered (which occurred in 1985), FNMA closed out a proportionate share of its short positions.

From the time the hedges were placed in May 1984 until the end of 1984, market interest rates declined, which resulted in FNMA's incurring and claiming a loss (which it incorporated into its 1984 Federal tax return) on its short positions (determined by marking to market) in regulated futures contracts in the amount of $21,965,387 covering its AHFC commitments. FNMA claimed losses for 1985 from its short positions in regulated futures and in call options in the amounts of $14,864,917 and $3,098,177, respectively. The total increase in value of the AHFC notes that were hedged was estimated by petitioner to be approximately $34.631 million. The effect of the hedges was to lock in the original purchase spreads on the AHFC commitments when the AHFC notes were priced.

For financial accounting purposes, petitioner classified the AHFC notes as conventional fixed rate mortgages and included these notes in its mortgage investment portfolio and apportioned its AHFC hedging losses over the life of the AHFC note (as required by hedging accounting).

## D. *Convertible Commitment Hedging*

In 1984 and 1985, FNMA also hedged all of its convertible commitments.

A commitment is an agreement between petitioner and an authorized lender under which petitioner agrees, for a fee, to purchase from the lender within a specified time period (the commitment period) one or more mortgages having a specified aggregate principal amount and possessing certain legal and underwriting characteristics, including a specified interest rate. Petitioner issued both standard and negotiated commitments.

In its standard commitment program, petitioner stood ready to purchase from authorized lenders (those meeting certain criteria established by FNMA) any and all mortgages that met petitioner's legal and underwriting criteria, without limit as to the aggregate principal amount purchased each day from all other authorized lenders. In 1984 and 1985, petitioner offered standard commitments for commitment periods of 30 days, 60 days, 90 days, or 120 days.

Petitioner would make known the minimum interest rate for which it would issue standard commitments to authorized lenders to purchase mortgages at par (referred to as the required net yield). However, petitioner would also issue commitments to purchase at a discount mortgages bearing interest rates below the required net yield.

FNMA entered into negotiated commitments to purchase mortgages from lenders. Negotiated commitments are individually negotiated agreements between petitioner and a lender and are used for mortgages not qualifying for standard commitments and for large or atypical transactions.

Petitioner determined the required net yield on its standard mortgage commitments and the terms of its negotiated commitments on the basis of a spread between the mortgage rate and the yield on 5-year Treasury securities. The net yields on FNMA's mortgage commitments were calculated so that it was expected that the purchase price of the mortgages would be approximately equal to their fair market value on the delivery date.

The commitments most frequently issued by petitioner to lenders called for mandatory delivery of the mortgages (mandatory delivery commitment). Under a mandatory deliv-

ery commitment the lender was obligated, as well as entitled, to deliver to petitioner mortgages of a specified principal amount, having a required net yield. Mandatory delivery could be obtained through either the standard or negotiated commitment program. Petitioner also entered into commitments in which delivery of the mortgages was optional on the part of the lenders.

FNMA offered lenders two types of standby or optional delivery commitments: (1) Market rate standby commitment; and (2) rate lock standby commitment (convertible commitment).

The following chart shows the amount of commitments entered into by petitioner requiring mandatory and optional delivery for 1984 and 1985:

| | 1984 | | 1985 | |
|---|---|---|---|---|
| Type | Amount | Percent | Amount | Percent |
| Mandatory | $15,373,000,000 | 73.18 | $16,837,000,000 | 83.25 |
| Optional: | | | | |
| Market rate standby | 5,539,200,000 | 26.37 | 3,229,000,000 | 15.97 |
| Convertible rate lock standby | 94,800,000 | .45 | 159,000,000 | .78 |
| | 21,007,000,000 | | 20,225,000,000 | |

A market rate standby commitment is a commitment by petitioner to purchase, for a fee, a designated amount of mortgage loans. To deliver the mortgage loans, the lender must convert the standby commitment to a mandatory commitment. The yield on the mortgage loans is established at the time of conversion, exposing FNMA to no interest rate risk.

A convertible (rate lock standby) commitment is a commitment by FNMA to sell to a lender, for a higher fee, the right but not the obligation to sell mortgages to petitioner at a specific price over a given time period for a fee that is higher than other commitment fees. If the lender exercises this right, this commitment converts to a mandatory commitment at the stated strike price. Under this type of commitment, it is to the lender's advantage to deliver mortgage loans only when mortgage yields rise above the specified commitment

yield. As a result, petitioner will usually have to take delivery against convertible commitments in rising rate environments when it is to petitioner's disadvantage to do so. Conversely, when interest rates decrease, lenders would choose to retain the mortgages since their value would have increased. Petitioner is compensated for its additional risk arising from a convertible commitment through an increased fee.

During 1984 and 1985, petitioner through its rate lock standby program issued guaranteed rate convertible commitments (GRCC), Triple Nickel Commitments (TNC), and certain other rate lock standby commitments (RLS). These three types of convertible commitments differed from one another in regard to the mortgage products which petitioner was willing to purchase under each of them.

Petitioner began in 1984 a program to hedge its convertible commitments, and in 1984 and 1985 it hedged all of these commitments. To hedge convertible commitments, FNMA utilized put options in futures contracts on Treasury securities that had expiration dates closely matching the expiration dates of the hedged commitments. The put options were chosen so that, in the event of an increase in interest rates, the put options would increase in value by an amount equal to the decline in value of the corresponding mortgages that FNMA was committed to purchase; the commitment fees were calculated to cover hedging costs.

The GRCC's were issued in 1984, and the corresponding put options expired in October of that year. FNMA reported the net amount of $551,890 as a hedging gain arising from commitment fees of $864,375 and loss on the associated put options of $312,485.

The TNC commitments and corresponding put options remained open at the end of 1984. Petitioner did not report any gain or loss from hedging the TNC commitments in 1984. The put options purchased to hedge the TNC optional commitments issued in 1984 expired in 1985. In 1985, petitioner continued to issue TNC optional commitments and hedge those commitments with put options. For 1985, FNMA reported a net gain of $121,182 on the TNC hedges based upon commitment fees of $876,878 and losses on the put options of $755,696.

FNMA hedged its RLS commitments in 1985 with put options, and reported for that year a net gain of $440,894 arising from these hedges. The net gain was derived from commitment fees in the amount of $2,327,407 less losses on the corresponding options in the amount of $1,876,513.[18]

The parties agree that as a result of accounting errors, petitioner understated its taxable income for 1984 and overstated its taxable income for 1985 as detailed in the following chart:

### Summary of Overreporting or (Underreporting) of Income for Tax Purposes

| Program | 1984 | 1985 | Total |
|---------|------|------|-------|
| GRCC | $106,053.35 | $49,563.69 | $155,617.04 |
| TNC | (107,709.75) | 165,816.50 | 58,106.75 |
| RLS | -0- | 252,759.00 | 252,759.00 |
| Total | (1,656.40) | 468,139.19 | 466,482.79 |

If the commitment were exercised, the option was sold. For financial accounting purposes, the net proceeds were deferred and treated as a yield adjustment on the mortgages purchased by petitioner under the commitment. If the commitment expired, the difference between the commitment fee and the option premium was taken in income.

## II. Tax Treatment of Short Sales of Treasury Securities and Put Options

### A. Treasury Securities

For Federal income tax purposes, petitioner accounted for its gains and losses arising from the short sales of Treasury securities in the year in which the short sale was closed out, except for one transaction.[19] In 1985, petitioner deducted a loss of $1,713,121 on a short sale that was not closed out until 1986, which amount represented accrued interest expense.

---

[18] As indicated, petitioner netted its fee income from its convertible commitment program against the losses suffered on the put options used to hedge these commitments. Respondent asserts that the commitment fees were ordinary income and the losses from the put option capital, and that netting these items for Federal tax purposes was improper. See *infra* sec. II of our findings and opinion.

[19] Except for the item mentioned next, respondent does not appear to question this method, except as to whether a particular income or expense was capital or ordinary.

FNMA computed the gain or loss on the short sale of Treasury securities as the net of: (1) The gain or loss on the Treasury principal; (2) the amounts in lieu of interest paid by petitioner during the period the short sale was open; and (3) the interest received by petitioner on the loan of the short sale proceeds.

On its 1984 tax return, FNMA computed its loss in the amount of $6,387,516 on its short sales of Treasury securities as follows:

| | |
|---|---|
| Gain/(loss) on Treasury principal ............................. | ($5,011,408) |
| Interest earned by petitioner on the loan of the short sale proceeds ............................................... | 6,980,056 |
| Amounts in lieu of interest paid by petitioner during the period the short sale was open ......... | (8,356,164) |
| Net gain/(loss) on short sales of Treasury securities ............................................................. | (6,387,516) |

On its 1985 return, petitioner claimed a loss of $52,929,372 on its short sales of Treasury securities computed as follows:

| | |
|---|---|
| Gain/(loss) on Treasury principal ............................. | ($45,137,870) |
| Interest earned by petitioner on the loan of the short sale proceeds ($9,237,061 + $549,760) ...... | 9,786,821 |
| Amounts in lieu of interest paid by petitioner during the period the short sale was open ($15,315,442 + $2,262,881) ................................. | [1](17,578,323) |
| Net gain/(loss) on short sales of Treasury securities ....................................................................... | (52,929,372) |

[1] Includes $1,713,121 of interest on short sales not closed out until 1986.

Respondent asserts that petitioner had ordinary income in the amounts of $6,980,056 for 1984 and $9,786,821 for 1985 from interest earned by petitioner on the loan of the short sale proceeds and that these amounts should not be included in deriving the net loss on the short sales of Treasury securities, which respondent determined was a capital item.

### B. *Put Options*

Petitioner netted its fee income from its convertible commitment program against the losses suffered on the put options used to hedge these commitments. See *supra* sec. I.D. Respondent asserts that the commitment fees were ordinary income, that the losses from the put options were capital,

and that netting these items for Federal tax purposes was improper.

### III. *Foreign Currency Swap Transactions*

In 1985, petitioner began to issue debt obligations on which the principal or interest or both were payable in whole or in part in Japanese yen. These were either "dual currency debt obligations" or "pure foreign currency debt obligations". A dual currency debt obligation is a debt obligation for which the proceeds borrowed and the interest payments are stated and payable in one currency and the principal payment due at the maturity of the obligation is stated and payable in a different currency. A pure foreign currency debt obligation is a debt obligation for which the proceeds received on the obligation, the interest payments made on the obligation, and the payment of principal made at the maturity of the obligation are all calculated and payable in a single foreign currency. For the sake of simplicity, the term "yen debt obligation" will be used for both types.

Concurrently with each yen debt obligation issued by petitioner in 1985, petitioner protected itself against the foreign currency exchange risks accompanying such debt obligation by entering into one or two currency swap agreements. A currency swap agreement is an agreement between two parties to exchange cash in one currency for cash in another currency on specified dates at specified exchange rates.

In cases in which there were two agreements, one agreement entitled and obligated petitioner to exchange the yen obtained from the yen debt obligation, net of underwriting commissions, for a fixed amount of U.S. dollars on the issue date of the obligation (the "closing date"). The second agreement, which was with a *different* counterparty, entitled and obligated petitioner to receive the fixed amount of yen it would need to make the yen payments due on the yen debt obligation in exchange for fixed dollar payments at the time that each yen payment on the yen debt obligation was due. In cases involving a single agreement, there was only a *single* counterparty, and both aspects of the swap transaction were embodied in a single document, but the economic effect was the same.

The following describes the typical chronological order of the relevant events relating to the issuance of yen debt obligations by petitioner in 1985. A bank would approach petitioner to solicit interest in a proposed yen debt obligation and related currency swap agreement(s). Following negotiations, petitioner and the bank would agree on the terms of the yen debt obligation and the currency swap agreement(s), and the date on which agreement was reached was referred to as the "pricing date". On this date, in the case involving debentures, petitioner would issue a press release announcing the debenture offering and would also seek approval of the terms of the agreements from the U.S. Department of the Treasury by letter and telephone.

Sometime after the pricing date, but before the closing date, the following would occur: (1) The bank, with petitioner's input, would select potential syndicate members and receive commitments from such syndicate members agreeing to participate in the debenture offering; (2) petitioner and the bank would execute the subscription (or underwriting) agreement (and other related agreement); (3) the agreement among the syndicate members would be executed; and (4) the official offering would begin with the distribution of the offering circular to each syndicate member. The currency swap agreement(s) were executed in each case on or prior to the closing date.

During 1985, petitioner issued two dual currency debt obligations and four pure foreign currency debt obligations. The dual currency debt obligations involved two debenture issuances whose proceeds and interest payments were stated and payable in yen, but whose principal payments at maturity were stated and payable in dollars (Dual Currency 85-1 and Dual Currency 85-2). The pure foreign currency debt obligations issued by FNMA in 1985 included: (1) A Euroyen debenture (Euroyen 85-1), which was a yen-denominated debenture issued in the Eurodollar market; (2) a Samurai debenture (Samurai 85-1), which was a yen-denominated debenture issued in the Japanese bond market; (3) a Domestic Yen debenture (Domestic Yen 85-1), which was a yen-denominated debenture issued in the U.S. market, and (4) a Syndicated Loan (Syndicated Loan 85-1), which was a loan denominated in yen given to petitioner by a consortium of banks and insurance companies.

The relevant dates of each yen debt obligation and related currency swap agreement(s) are as follows:

| Debt obligation | Pricing date | Subscription agreement [1] | Currency swap agreements | Closing date |
|---|---|---|---|---|
| Euroyen 85-1 | 2/7/85 | 2/14/85 | 2/20/85 | 2/20/85 |
| Samurai 85-1 | 8/12/85 | 8/21/85 | 8/21/85 | 8/28/85 |
| Dual Currency 85-1 | 8/14/85 | 8/29/85 | 8/29/85 | 10/1/85 |
| Domestic Yen 85-1 | 10/9/85 | 10/17/85 | 10/17/85 | 10/24/85 |
| Dual Currency 85-2 | 10/9/85 | 10/23/85 | 10/23/85 | 11/1/85 |
| Syndicated Loan 85-1 | 12/11/85 | 12/19/85 | 12/19/85 | 12/19/85 |

[1] In the case of the Domestic Yen 85-1 and Samurai 85-1 offerings, an underwriting agreement was used rather than a subscription agreement. In the case of Syndicated Loan 85-1, a loan agreement was used rather than a subscription agreement. This difference in terminology is not significant.

The combined economic effect of each yen debt obligation and the corresponding currency swap agreement(s) in 1985, after the agreements were executed, was to leave petitioner with a fixed amount of net dollar proceeds and a series of fixed net dollar payment obligations. In other words, what FNMA did was to convert, assuming no swap counterparty default, the yen proceeds and yen interest and principal payments into U.S. dollars and a series of fixed U.S. dollar net payment obligations, respectively. As a consequence, the movements in the yen/dollar exchange rate would not affect FNMA's effective borrowing cost of each of the yen debt obligations issued in 1985. These arrangements took place only with respect to debt obligations issued in 1985.

The "effective borrowing cost" of a debt issue is calculated as the difference between: (1) The present value of the future interest and principal payments; and (2) the net proceeds received by the borrower. The effective borrowing costs on the net dollars resulting from each of petitioner's yen debt obligations (and corresponding swap transaction(s)) in 1985 were less than the borrowing cost petitioner could have achieved on an actual dollar denominated debt obligation having the same maturity in the U.S. market. With respect to each of the yen debt obligations and swap agreements, any movement of the spot rate between the pricing date and the closing date did not affect the effective borrowing cost because the swap agreement(s) eliminated the risk of a gain

or loss from all intervening currency fluctuations. All of petitioner's swap agreements in 1985 were legally conditioned upon petitioner's entering into a related yen borrowing.

Although the currency swap agreements protected petitioner from the risk of currency fluctuations, petitioner was subject to the risk that one of its swap counterparties would default on its contractual obligation to make yen payments to petitioner. The risk described in the prior sentence is referred to as "counterparty risk". To minimize counterparty risk, petitioner would do business only with counterparties that had a credit rating of double A or better. To date, no default by a counterparty has occurred.

On its 1985 Federal tax return, petitioner reported on Schedule M an ordinary "loss from forward sale of borrowed foreign currency" in the amount of $31,181,296. This reported loss comprised: (1) A loss of $23,628,257 with respect to the currency swap agreement relating to the Dual Currency 85-1 debenture; (2) a loss of $8,147,781 with respect to the currency swap agreement relating to the Dual Currency 85-2 debenture; and (3) a gain of $594,743 with respect to the currency swap agreement relating to the Domestic Yen 85-1 debenture.

The loss claimed to have arisen from the currency swap agreement relating to the Dual Currency 85-1 debentures equaled the difference between: (1) $232,946,554, which amount represented the value in dollars of the yen proceeds from the debenture offering at the exchange rate on the closing date as reported in the Wall Street Journal (WSJ exchange rate);[20] and (2) $209,318,297, which was the amount due to petitioner on the closing date pursuant to the related currency swap agreement, before netting a $150,000 expense reimbursement due the counterparty. FNMA used the same methodology to determine the gain or loss arising from the other two currency swap agreements, and its reported loss from the forward sale of borrowed foreign currency was the net of these three currency swaps.[21]

---

[20] The parties agree that the public yen/dollar exchange rate to use for the purposes of this case is that appearing in the Wall Street Journal attributable to the date in question (WSJ exchange rate).

[21] The parties agree that petitioner used incorrect exchange rates in determining the gains and losses from its foreign currency exchanges related to its Dual Currency 85-2 and Domestic Yen 85-1 debenture issuances, even assuming, arguendo, that petitioner's methodology was cor-

The dollar value of the aggregate gross proceeds of the Dual Currency 85-1 debentures on the closing date using the WSJ exchange applicable to that date was $237,634,787. The difference between this amount and the aggregate redemption price of $240,400,000 is equal to $2,765,213. For Federal income tax purposes, petitioner has been treating this latter amount as original issue discount and deducting it as an additional cost of borrowing over the 10-year life of the Dual Currency 85-1 debentures.

No foreign currency gains or losses were reported or reflected on petitioner's Federal income tax return for 1985 with respect to the currency swap transactions relating to the Euroyen 85-1, Samurai 85-1, and Syndicated Loan 85-1 debenture issuances. Had petitioner applied the same methodology used to derive the 1985 reported loss from forward sale of borrowed foreign currency to these currency swaps, they would have yielded a gain of $4,261,043, a loss of $65,188, and a gain of $1,157,034, respectively. Petitioner concedes that, if its methodology is proper, these amounts must be included in determining its net loss from all of the 1985 currency swaps and that, consequently, the net loss it should have reported from such transactions on its 1985 return was $25,576,475.

Respondent disallowed petitioner's claimed loss for 1985 from this yen/dollar exchange activity, as it would be carried back to the years before us.

Appendices A and B, attached to this opinion, provide relevant facts regarding the 1985 currency swap arrangements.

OPINION

## I. *Hedging*

### A. *In General*

We first consider whether the transactions arising from petitioner's hedging program were truly hedges. The stipulation of nearly all of the relevant facts has greatly simplified the analysis of this aspect of the case. Nonetheless, each side

---

rect. The parties stipulate that the WSJ exchange rates for the closing dates were 208.75 and 216.46 yen/dollar, respectively. As a result, the loss arising from the foreign currency relating to the Dual Currency 85-2 debentures should have been $7,965,858, and the gain from the foreign currency swap relating to the Domestic Yen 85-1 debentures $664,751, according to petitioner's methodology.

has viewed those facts through its own lenses and reached differing conclusions.

Respondent claims that "The absence of a comprehensive program to hedge each element of * * * [FNMA's] interest rate risk illustrates the difficulty of determining the exact business function of petitioner's individual hedging transactions." Essentially, respondent maintains that the record does not establish that the business purpose of FNMA's futures transactions was to reduce interest rate risk. However, respondent's effort in this regard is half-hearted.[22] Apparently by disputing the characterization of these transactions as hedges, respondent intends to show that such inquiry, if relevant, introduces a business motivation test into the analysis of the nature of an item of property, and thus provides an opportunity for taxpayers to whipsaw the Government, depending on which classification, ordinary or capital, happens to be of advantage to the taxpayer.[23]

Petitioner concedes that it did not hedge every debenture issuance or mortgage commitment in either 1984 or 1985 but claims that it did offset the interest rate risk of those debenture issuances or mortgage commitments that it did hedge.

Whether a transaction constitutes a hedge for Federal income tax purposes is a question of fact. *Fulton Bag & Cotton Mills v. Commissioner,* 22 T.C. 1044, 1052 (1954).[24] "A hedge is a form of price insurance; it is resorted to by business men to avoid risk of changes in the market price of a commodity. The basic principle of hedging is the maintenance of an even or balanced market position." *Commissioner v. Farmers & Ginners Cotton Oil Co.,* 120 F.2d 772, 774 (5th Cir. 1941), revg. 41 B.T.A. 255 (1940). Further, "A hedge * * * is not a transaction looking to a favorable fluctuation in price for the realization of profit on the particular futures

---

[22] Although respondent introduced into the record evidence regarding the nature of petitioner's transactions, respondent barely referred to or discussed this issue in either the opening or reply briefs.

[23] Courts have not shied away from nor objected to deciding the actual nature of a putative hedging transaction. *Hoover Co. v. Commissioner,* 72 T.C. 206 (1979); *Muldrow v. Commissioner,* 38 T.C. 907 (1962). Furthermore, the Supreme Court in *Arkansas Best Corp. v. Commissioner,* 485 U.S. 212, 221 (1988), acknowledged the relevance of business connection when deciding whether certain of the statutory exceptions of sec. 1221, including the inventory exception, apply to the particular property under scrutiny. Cf. *Frederick Weisman Co. v. Commissioner,* 97 T.C. 563, 573 n.4 (1991).

[24] In the cases cited in this part of our opinion—pre-1988—the courts accepted the proposition that hedging transactions that were integrally related to the taxpayer's business received ordinary treatment.

contract itself". *Muldrow v. Commissioner,* 38 T.C. 907, 913 (1962).[25]

A bona fide hedge requires: "(1) A risk of loss by unfavorable changes in the price of something expected to be used or marketed in one's business; (2) a possibility of shifting such risk to someone else, through the purchase or sale of futures contracts; and (3) an intention and attempt to so shift the risk." *Muldrow v. Commissioner, supra* at 913 (citing *Sicanoff Vegetable Oil Corp. v. Commissioner,* 27 T.C. 1056, 1067 (1957), revd. on other issues 251 F.2d 764 (7th Cir. 1958)). However, this definition does not cover all hedges, so that the facts of the individual case determine whether the transaction is to receive such treatment. *Battelle v. Commissioner,* 47 B.T.A. 117 (1942).

Among the factors this Court has considered in determining whether a transaction constitutes a hedge are: (1) The relation of the prices of the futures position and the hedged position, *Wool Distributing Corp. v. Commissioner,* 34 T.C. 323, 331 (1960); (2) the size of the futures position relative to the long position, *Stewart Silk Corp. v. Commissioner,* 9 T.C. 174, 179 (1947); (3) the holding period for the futures contracts, *Lewis v. Commissioner,* T.C. Memo. 1980-334; (4) evidence of market trends, *Myers v. Commissioner,* T.C. Memo. 1986-518; and (5) the manner in which the taxpayers recorded and reported the futures transactions, *Sicanoff Vegetable Oil Corp. v. Commissioner,* 27 T.C. 1056, 1068 (1957), revd. on other issues 251 F.2d 764 (7th Cir. 1958). Further, a transaction is no less a hedge if the risk to be avoided is only partially offset. *Stewart Silk Corp. v. Commissioner, supra* at 179.

We agree with petitioner that the transactions described in section I of our findings constitute hedges.[26] The record overwhelmingly supports a finding that the transactions in issue were microhedges, which were meant to offset the risk that interest rates would increase, an event which would reduce,

---

[25] The hedges described in cases cited in this portion of the opinion refer to true hedges; i.e., where there is a fixed position which the hedge offsets. See *Muldrow v. Commissioner, supra* at 913. It is also possible to hedge certain risks where a position is not offset, such as where a manufacturer concerned about rising prices takes a long position in a commodity used in its manufacturing process. See *Corn Products Refining Co. v. Commissioner,* 350 U.S. 46 (1955). Such positions are referred to as partial hedges.

[26] Its hedging transactions were of two types: (1) Hedging the asset side (commitment hedging); and (2) hedging the liability side (debenture hedging).

or possibly negate, petitioner's anticipated profit on a particular transaction.[27] The ample record is replete with numerous documents regarding these hedging transactions. FNMA's A&L Committee issued hedge strategy memoranda authorizing the office of risk management to engage in certain transactions to hedge the interest rate risk associated with the issuance of particular debentures and mortgage commitments. Furthermore, petitioner prepared weekly status reports on its hedging activity. Publicly, petitioner reported the futures transactions as hedges on its tax returns, and its representatives discussed FNMA's hedging activity with outside groups.

The effect of hedging in petitioner's situation was to lock in a certain interest rate which in turn would provide it with a particular spread between the interest it earned on certain assets and the interest it paid on its debentures. Petitioner's positions with respect to its mortgage portfolio and the mortgages it was to acquire were substantially fixed in advance, such that hedging the debenture issuances ensured petitioner of a certain interest cost and hence profit margin. Commitment hedging offset the risk that petitioner would take delivery of mortgages covered by a commitment whose value had decreased as a result of higher interest rates.

In light of precedent and the evidence mentioned above, we are persuaded that the transactions described herein were true hedges.[28]

---

[27] Macrohedging, in contrast, involves neutralizing the interest rate risk on an aggregate pool of assets and liabilities, which respondent apparently regarded as the only type of hedging that, for petitioner, would constitute hedging for purposes of Federal tax law. However, even respondent's experts did not question that the futures contracts at issue were microhedges. Thus, Alan C. Shapiro, one of respondent's experts, testified on re-cross-examination that an effective hedge would arise where a position is taken to offset the exposure of the original position, but it may fail as a hedging *program,* which was the measure by which he and respondent analyzed FNMA's actions. It would have been neither possible nor prudent for petitioner to hedge its entire interest rate risk, since the amount of futures required would have exceeded the capacity of the markets, and FNMA would have locked in a significant loss.

[28] In deciding as we do, we acknowledge the argument made by respondent's experts that petitioner failed to hedge its overall interest rate risk, and in fact the record would support a finding that the effect of the futures transactions on FNMA's interest rate risk was minimal. Even if the effect were small, the futures transactions did reduce the risk with respect to the individual transactions they were designed to cover, and for our purposes that is sufficient. A taxpayer is not required to negate its entire risk, nor must it hedge every transaction in order to lock in a particular return. since hedges by their very nature are meant to avoid risk of loss (similar to insurance), but not necessarily all risk to which a taxpayer is exposed. See *Stewart Silk Corp. v. Commissioner,* 9 T.C. 174, 179 (1947).

## B. *Hedging Transactions Under Section 1221*

### 1. *Background*

This case, accepting as we do that the transactions engaged in by petitioner were hedges, involves the issue of whether the gain or loss arising from the disposition of the hedge instruments is capital or ordinary. The resolution of this issue in particular has either been rendered easier or more complex, depending on one's point of view, since the Supreme Court's decision in *Arkansas Best Corp. v. Commissioner,* 485 U.S. 212 (1988), in which the Court revisited *Corn Products Refining Co. v. Commissioner,* 350 U.S. 46 (1955), a case involving commodity hedging.

Our analysis begins with section 165(a), which allows a deduction for any loss sustained during the taxable year. However, if the loss is the consequence of the sale or exchange of a capital asset, it is subject to section 1211(a), which in the case of corporations limits such loss to the extent of gain from the sales or exchanges of capital assets. Sec. 165(f). Section 1221 provides that the term "capital asset" means property held by a taxpayer, but specifically excludes five classes of property.[29]

---

[29] SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

(2) property used in his trade or business, of a kind which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

(3) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by—

(A) a taxpayer whose personal efforts created such property,

(B) in the case of a letter, memorandum, or similar property, a taxpayer for whom such property was prepared or produced, or

(C) a taxpayer in whose hands the basis of such property is determined, for purposes of determining gain from a sale or exchange, in whole or part by reference to the basis of such property in the hands of a taxpayer described in subparagraph (A) or (B);

(4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1);

(5) a publication of the United States Government (including the Congressional Record) which is received from the United States Government or any agency thereof, other than by purchase at the price at which it is offered for sale to the public, and which is held by—

(A) a taxpayer who so received such publication, or

(B) a taxpayer in whose hands the basis of such publication is determined, for purposes of determining gain from a sale or exchange, in whole or in part by reference to the basis of such publication in the hands of a taxpayer described in subparagraph (A).

Futures contracts, either long or short, have been consistently treated as property for purposes of section 1221 and its predecessors. E.g., *Modesto Dry Yard, Inc. v. Commissioner,* 14 T.C. 374 (1950) (long position); *Hoover Co. v. Commissioner,* 72 T.C. 206 (1979) (short sale); see also *King v. Commissioner,* 89 T.C. 445 (1987); *Smith v. Commissioner,* 33 T.C. 465 (1959), affd. in part, revd. in part and remanded 313 F.2d 724 (8th Cir. 1963). Without taking into account their use as a hedge, the interest rate futures contracts, put options, and Treasury notes involved in this case are property, and petitioner does not assert otherwise. Thus petitioner, to prevail, must show that the property used in the hedges is excepted from capital treatment under section 1221.

Since the exceptions relating to property used in the taxpayer's trade or business (sec. 1221(2)), to copyrights, or to publications of the U.S. Government (sec. 1221(3) or (5)) are plainly not applicable to the instant case, the only statutory exceptions in which petitioner might find comfort are section 1221(1) or (4).

The Supreme Court has recently addressed the operation of section 1221 in *Arkansas Best Corp v. Commissioner, supra.* In that case, the Court held that the disposition of bank stock by the taxpayer, which had been acquired with the purpose of preventing damage to its business reputation, resulted in capital loss. The taxpayer had argued, conceding that the statutory exceptions did not apply, that its disposition of the stock was covered by the doctrine arising from *Corn Products Refining Co. v. Commissioner, supra,* in which, so the taxpayer asserted, the Supreme Court had carved out a nonstatutory exception whereby property acquired and held with a business purpose qualified as a noncapital asset (*Corn Products* doctrine). The Court concluded "that a taxpayer's motivation in purchasing an asset is irrelevant to the question whether the asset is 'property held by a taxpayer (whether or not connected with his business)'". *Arkansas Best Corp. v. Commissioner, supra* at 223. In so holding, the Court revisited *Corn Products Refining Co. v. Commissioner, supra.*

The taxpayer in *Corn Products* was a company that used corn to produce starches, sugars, and other products. To assure itself of an adequate supply of corn and to avoid the

effect of price increases, it began, following sharp increases in the price of corn in the thirties, a program of buying corn futures, taking a long position in the commodity. Unless a shortage of corn was imminent, the company would take delivery under some of the contracts and sell off the remainder.

The Court in *Arkansas Best v. Commissioner, supra* at 222, held:

> *Corn Products* is properly interpreted as standing for the narrow proposition that hedging transactions that are an integral part of a business' inventory-purchase system fall within the inventory exclusion of section 1221. [Fn. ref. omitted.]

*Arkansas Best* has changed the analysis in determining the character of property. The doctrine arising from *Corn Products,* which provided a nonstatutory exception to capital asset treatment for property held by a taxpayer with a business motive, has been markedly cut back. It is also clear that under *Arkansas Best,* except for one nonstatutory exception,[30] the disposition of property normally results in ordinary gain or loss only if it falls within one of the statutory exceptions to capital asset treatment listed in section 1221. See *Azar Nut Co. v. Commissioner,* 94 T.C. 455 (1990), affd. 931 F.2d 314 (5th Cir. 1991); *Michelson v. Commissioner,* T.C. Memo. 1990-27, affd. 951 F.2d 288 (10th Cir. 1991); *Dial v. Commissioner,* 968 F.2d 898 (9th Cir. 1992), affg. T.C. Memo. 1990-9; *Swartz v. Commissioner,* 876 F.2d 657 (8th Cir. 1989), affg. T.C. Memo. 1987-582; *Barnes Group Inc. v. United States,* 697 F. Supp. 591 (D. Conn. 1988), vacated on other grounds 872 F.2d 528 (2d Cir. 1989); *Circle K Corp. v. United States,* 23 Cl. Ct. 665 (1991); 2 Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 51.10.3, at 51-54 (2d ed. 1990). However, as the Court affirms at several points, the exceptions under section 1221 may be broadly interpreted, and thus property (e.g., futures), even though it does not fall literally within any of the exceptions, may be so related to other property excepted in the statute (e.g., inventory) that it should receive ordinary treatment as

---

[30] The only nonstatutory exception to capital treatment alluded to in *Arkansas Best Corp. v. Commissioner,* 485 U.S. 212, 217 n.5 (1988), involves claims of right, in which gain upon the sale of what otherwise is property to which no statutory exception under sec. 1221 applies is properly treated to the extent required as ordinary income rather than capital.

well. *Arkansas Best Corp v. Commissioner,* 485 U.S. at 220, 221, 223 (futures transactions in *Corn Products Refining Co. v. Commissioner,* 350 U.S. 46 (1955), receive ordinary treatment through nonliteral application of section 1221(1)).

FNMA's hedges do not fit under any literal application of the statutory exceptions to capital treatment found in section 1221, nor does petitioner appear to hold assets to which these same exceptions would apply, unless the money which FNMA uses to buy mortgages is to be considered its inventory, sec. 1221(1), or its mortgages be considered property described in section 1221(4), as to which, see *infra.*[31] Thus, the analysis of *Arkansas Best* might, at first blush, seem to preclude ordinary treatment of the gains or losses arising from petitioner's hedging transactions although they offset, to a limited extent,[32] a risk that petitioner encounters in its business.

Respondent, in light of *Arkansas Best,* concludes that the property used as hedges must receive capital asset treatment. Respondent reasons that, since FNMA's hedge positions were property and do not come within any of the exceptions of section 1221, the net losses arising from the disposition of such assets are capital and not ordinary.

Petitioner makes several arguments in favor of ordinary treatment of its hedging transactions. It asserts first that such transactions constitute a nonstatutory exception to capital treatment; second, that its hedging losses were substitutes for interest expense; third, that the hedging transactions were an integral part of the system by which FNMA purchased and held mortgages; fourth, that Congress implicitly codified ordinary treatment for business hedging gains and losses; and fifth, that Rev. Rul. 72-179, 1972-1 C.B. 57, requires respondent to treat FNMA's hedging losses as ordinary.

In view of our disposition of the issue in this case, see *infra,* we do not need to face the question whether there still exists a nonstatutory exemption to section 1221 (other than the one mentioned *supra* note 30), but we leave it to another

---

[31] We note, as mentioned in our findings of fact, that respondent and petitioner executed a closing agreement in 1977 that provided that all sales of mortgages held by FNMA generate ordinary gains and losses.

[32] The record does not quantify the extent to which petitioner's overall interest rate risk was affected by its hedging transactions. We are, however, persuaded that the hedging reduced interest rate risk.

case on another day, where it may be squarely presented. Similarly, we decline to address petitioner's arguments that its hedging losses were substitutes for interest expense, that ordinary treatment for business hedging gains and losses has been implicitly codified, and that respondent is bound by Rev. Rul. 72-179, *supra,* to treat the hedging losses as ordinary.

### 2. *FNMA's Hedging Transactions Were an Integral Part of the System by Which FNMA Purchased and Held Mortgages*

In *Arkansas Best,* 485 U.S. at 221, discussing *Corn Products,* the Supreme Court stated:

This discussion [*Corn Products,* 350 U.S. at 51-53] * * * convinces us that although the corn futures were not "actual inventory," their use as an integral part of the taxpayer's inventory-purchase system led the Court to treat them as substitutes for the corn inventory such that they came within a broad reading of "property of a kind which would properly be included in the inventory of the taxpayer" in section 1221.

Petitioner argues that by focusing attention on whether the asset was acquired and sold as an integral part of the taxpayer's everyday business operations, the Court in *Corn Products* intended to create a general exemption from capital-asset status for assets acquired for business purposes. We believe petitioner misunderstands the relevance of the Court's inquiry. A business connection, although irrelevant to the initial determination whether an item is a capital asset, is relevant in determining the *applicability of certain of the statutory exceptions, including the inventory exception.* The close connection between the futures transactions and the taxpayer's business in *Corn Products* was crucial to whether the corn futures could be considered surrogates for the stored inventory of raw corn. * * * [Emphasis added.]

Respondent claims that this holding is that property that does not literally come within any statutory exception to section 1221 qualifies for ordinary treatment only, saying on brief:

if it (1) is an integral part of the taxpayer's inventory purchase system; and (2) is capable of treatment as a "substitute" or "surrogate" for inventory (that is behaves economically just like the inventory).

The Supreme Court in *Arkansas Best,* however, quoted above, referred to the "applicability of certain of the statutory exceptions, *including the inventory exception.*" 485 U.S. at 221 (emphasis added). Although the Supreme Court con-

cluded that *Corn Products* involved the inventory exception, the Supreme Court did not preclude ordinary treatment for gains or losses from disposition of assets that were integrally related to other exceptions in section 1221.

Based upon her reading of *Arkansas Best,* respondent makes several general arguments against treating the hedging transactions here at issue as integrally related to FNMA's purchasing and holding of mortgages.

Respondent asserts that for a hedge to receive ordinary treatment under section 1221, it must involve the same property as is being hedged. We disagree. Petitioner's mortgage notes are "notes receivable" within the meaning of section 1221(4), and the hedging transactions in connection with their acquisition were surrogates for petitioner's mortgage notes. Petitioner clearly "actually holds" mortgages which are "notes receivable, acquired in the ordinary course of trade or business for services rendered". Sec. 1221(4). The hedging transactions dealt with other types of notes receivable. Petitioner's assets which were the subject of petitioner's hedging transactions acted as surrogates for mortgage notes during the time periods between borrowing and lending decisions and their implementation. The focus in *Corn Products* was on the utility of the hedge to ward off financial loss. *Arkansas Best v. Commissioner,* 485 U.S. at 220-221; *Corn Products Refining Co. v. Commissioner,* 350 U.S. at 51; *Corn Products Refining Co. v. Commissioner,* 215 F.2d 513, 516 (2d Cir. 1954). Further, the emphasis in the cases cited in this opinion involving hedges was on the use of the particular hedge to assure that the price of an asset would be stabilized, rather than that the asset could be acquired. Thus, we conclude that it is not necessary for the ordinary treatment of a hedge under section 1221 that it be in the asset that petitioner actually holds or intends to acquire.

On the same ground, we do not believe, as respondent claims, that only hedges involving long positions with respect to an asset excepted from capital treatment under section 1221 are entitled to ordinary treatment. A short position, as well as a long position, can serve in the proper instance to stabilize the price of assets that are held or are to be acquired.

Finally, we do not agree with respondent's contention that the hedges related to the issuance of petitioner's debentures

could not come within any exception to section 1221 since debentures are not assets, but rather liabilities. We note that respondent's position is inconsistent with section 1256(e) in which hedging transactions are specifically excepted from being marked to market under section 1256(a). Hedging transactions include, inter alia, transactions that "reduce risk of interest rate or price changes * * * with respect to borrowings made or to be made" in the normal course of a taxpayer's business so long as the gains or losses would be treated as ordinary. Sec. 1256(e)(2)(A)(ii) and (B). It strikes this Court as odd that Congress would provide an exception to the marked to market regime that would effectively serve no purpose, if, as respondent claims, property serving to hedge a borrowing were not excepted under section 1221.

Petitioner conceded by stipulation that the mortgages were not within the scope of section 1221(1). Thus, only section 1221(4) is considered here.

FNMA argues that its hedging transactions are excepted from capital asset treatment though an extension of the analysis in *Arkansas Best.* Petitioner asserts that its mortgages were ordinary assets either because the 1977 closing agreement treated them as such, or because they were property coming within section 1221(4). Petitioner then argues that the hedging positions may be treated as surrogates for the mortgages under the reasoning of *Arkansas Best.*

Petitioner construes *Arkansas Best* broadly, arguing that it reaches positions designed to hedge ordinary assets. We are unwilling to extend the case so far; we conclude that to the extent that its mortgages fall within one of the statutory exceptions to capital asset treatment, petitioner may rely on the general reasoning of *Arkansas Best* to obtain ordinary treatment for the hedges relating to these assets.

In *Burbank Liquidating Corp. v. Commissioner,* 39 T.C. 999, 1009 (1963), affd. in part and revd. in part 335 F.2d 125 (9th Cir. 1964), this Court held that "mortgage loans made [by a savings and loan] in the ordinary course of its business are 'notes receivable acquired * * * for services rendered' [the rendering of the service of making loans] and, thus, are ordinary rather than capital assets" under section 1221(4). Petitioner asks us to hold that the mortgages it acquired and held were covered by section 1221(4) since they were "notes

receivable acquired in the ordinary course of its business" for the service of "providing liquidity to the secondary market."

Respondent contends that, although the making of loans may be a service, the acquisition of mortgages on the secondary market does not constitute a service to the mortgage issuer. While we agree that petitioner was not the originating lender, we do not believe that the difference between an originating lender and FNMA is determinative. Instead, we look to see whether FNMA is providing a service in acquiring the mortgages in its portfolio.

We note initially that petitioner's operation is restricted by statute and regulations designed to further its purpose—to provide stability to the secondary market for home mortgages and liquidity for originating lenders, allowing them to extend further loans. The actual operation of FNMA further supports that it was providing a service in exchange for the mortgages. We believe that mortgage issuers benefited from FNMA's activity, which serves to increase the level of bank lending; it was a service to the mortgage lending business and the members thereof.

For the hedging positions to come within section 1221(4) and obtain ordinary treatment, they must have been integrally related to FNMA's purchasing and holding of mortgages. *Arkansas Best v. Commissioner, supra.* Since we have concluded that the futures and short sales transactions were hedges of both FNMA's mortgage commitments and the debentures it issued, we believe that they were integrally related to both the purchasing and holding by petitioner of its mortgage portfolio. The hedging positions, like FNMA's commitments, were contracts for the purchase and sale of debt instruments. As regards the commitment hedges, the conclusion of integral relationships easily follows because the futures contracts were designed to offset the decline in value of the mortgages subject to the commitments prior to their acquisition. With respect to FNMA hedging the debenture issuances, the analysis requires further formulation. In that circumstance, the debentures were used to acquire new mortgages or to refinance expiring debt. The hedges allowed petitioner to lock in the spread available on the day the futures were executed when it believed interest rates were to rise.

Petitioner set the terms of its mortgage commitments in advance of their acquisition based upon the then-current

interest rate. It also required funds to refinance its expiring debt, thereby allowing it to maintain its mortgage portfolio. However, FNMA was limited by law as to when it could issue debt. Through its hedging program, petitioner locked itself into an interest rate that justified its mortgage commitments and refinancing in light of petitioner's belief that interest rates would rise prior to issuance of the corresponding debt.

Given petitioner's mandated purpose, the restrictions on its behavior, and its actual operation, we believe that petitioner's acquisition of mortgages is designed to enhance the efficiency of the secondary market in mortgages. On this basis, we hold that the mortgages in its portfolio fall within section 1221(4); *Burbank Liquidating Corp. v. Commissioner, supra.*[33] Petitioner's hedging positions—both of its proposed debentures and its mortgage commitments—served the same purpose as petitioner's purchases and sales of mortgages, to wit, maintenance of an excess of interest earned over interest expended. The hedging positions that FNMA took in the securities market in order to protect its interest position made these hedging securities the "surrogates" for the mortgages it was committed to buy, and the interest it would have to pay on the money it borrowed to acquire those mortgages in the same sense that corn futures were surrogates for corn in *Corn Products.* The transactions were surrogates and the income or loss from each transaction should have the same character. Thus, we conclude that petitioner's hedging transactions bear a close enough connection to its section 1221(4) mortgages to be excluded from the definition of capital asset.

## II. *Tax Treatment of Short Sales of Treasury Securities and Put Options*

FNMA, in computing its gains or losses arising from the hedging of convertible commitments and debentures, included certain items that are normally considered ordinary income—commitment fees and interest earned on the proceeds from the short sale of Treasury securities. Respondent maintains, in light of its assertion that the properties used by FNMA as hedges were capital assets, that these items of

---

[33] According to the 1977 settlement agreement, petitioner's mortgages produce ordinary gain or loss upon sale, and the parties stipulated that the mortgages were not inventory for purposes of sec. 1221(1). We believe that these circumstances support our conclusion that the mortgages in FNMA's portfolio are covered by sec. 1221(4).

ordinary income and the gain or loss from the hedges be accounted for separately.

Petitioner claims that this issue was not properly raised by respondent in the notice of deficiency or in either the answer or amended answer, and, even if properly raised, the burden is on respondent. We disagree with petitioner. The notice of deficiency disallowed the carryback of net operating loss for 1984 to 1974 and 1975, and respondent in the amended answer denied that petitioner was entitled to a net operating loss deduction for 1975 carried back from 1985, the entitlement to which petitioner asserted in its amended petition.[34] In either instance, we have jurisdiction to determine the correct amount of the net operating loss for 1984 and 1985. Sec. 6214(a) and (b).

We note that respondent's position with respect to petitioner's accounting method of combining items of ordinary income with its gains or losses from the related hedging transactions did not constitute a new matter, an increase in deficiency, or an affirmative defense. It relates directly to the determination of the correct amount of net operating loss in 1984 and 1985 to be carried back to the years in issue. Thus, the burden is on petitioner to establish that it is entitled to net operating loss deductions for 1974 and 1975 carried back from 1984 and 1985. Rule 142(a).

As a result of our holding in this opinion regarding the ordinary character of FNMA's hedging gains or losses, however, this issue is largely rendered moot. In this instance, the hedges yielded ordinary gains or losses, and, thus, whether they were combined with the related fees and interest, as FNMA did, or accounted for separately, as respondent asserts, would make no difference to FNMA's net operating loss for 1984 or 1985.

Petitioner, however, deducted as part of its 1985 loss from a short sale of Treasury securities the interest expense on a transaction that was not closed out until 1986. Since the transaction giving rise to this loss was not "closed and completed" in 1985, petitioner, though an accrual method taxpayer, is not entitled to include this interest as part of its

---

[34] We may determine the correct amount of NOL, as well as taxable income and tax, for a year not in issue as a preliminary step in determining the correct amount of an NOL carryover to a taxable year in issue. Sec. 6214(b); *Calumet Industries, Inc. v. Commissioner,* 95 T.C. 257, 274 (1990).

loss in determining its net operating loss for 1985, under the "completed transaction" method which it used. Sec. 1.165-1(b), Income Tax Regs. This interest item should therefore be excluded from the 1985 computation; otherwise, we agree with petitioner.

## III. *Gains or Losses Arising From FNMA's Currency Swap Transactions*

The last issue we must resolve is whether petitioner recognized ordinary gains or losses from its disposition of yen pursuant to its currency swap agreements in 1985.

Respondent takes the position that since the economic effect of petitioner's yen denominated and dual currency debt obligations and their related currency swap agreements was to eliminate any risk of currency fluctuation, petitioner's recognizing gains and losses from the currency swaps under section 165 was not proper.[35] In reaching this conclusion respondent relies on two lines of cases. Respondent cites cases which, inter alia, involve applications of the step transaction doctrine, and, second, cases which deny losses where the claimed losses were not genuine. In the alternative, respondent asserts:

In an arrangement like petitioner's, however, where the yen loan and a related swap are agreed to on the same date and closing follows at a later date, the closing date dollar value of the yen can be irrelevant to basis. The dollar value of the yen, in effect, is fixed on the pricing date through the related swap arrangement. Therefore, it may be that the petitioner should have used the pricing date dollar value as its basis for the yen. Had petitioner done so, petitioner would have had no computational loss as a result of the swap.

Petitioner on the other hand argues that since foreign currency transactions are accounted for under the "separate transactions principle", which requires that exchange gain or loss be separately accounted for apart from any gain or loss attributable to an underlying transaction, it was entitled to claim, according to its methodology, the net loss from its

---

[35] The regulations provide that for a loss to be deductible under sec. 165(a) it "must be evidenced by closed and completed transactions, fixed by identifiable events * * * actually sustained during the taxable year", and "bona fide". Sec. 1.165-1(b), Income Tax Regs. With respect to these requirements, respondent contends on brief only that the gains and losses from the yen swap transactions are not bona fide.

exchange of yen for dollars pursuant to its currency swap agreements in 1985.

Under the principles of Federal tax law relevant to this case, foreign currency is considered property. *National-Standard Co. v. Commissioner,* 80 T.C. 551, 558 (1983), affd. 749 F.2d 369 (6th Cir. 1984); *Gillin v. United States,* 191 Ct. Cl. 172, 423 F.2d 309 (1970). The borrowing and repayment of foreign currency, on the one hand, and the investment in and sale of property acquired with the borrowing, on the other, receive separate treatment for purposes of determining gain or loss. *KVP Sutherland Paper Co. v. United States,* 170 Ct. Cl. 215, 344 F.2d 377 (1965); see *National-Standard Co. v. Commissioner, supra.* The basis of foreign property acquired (yen here) is controlled by the effective exchange rate in dollars on the date of the transaction. *Joyce-Koebel Co. v. Commissioner,* 6 B.T.A. 403 (1927); *Bernuth Lembcke Co. v. Commissioner,* 1 B.T.A. 1051 (1925).[36] The facts are not disputed. The yen denominated debt obligations issued by FNMA and their related currency swap agreements involved at least five distinct events: (1) Agreement as to the terms of the debt obligations and the related currency swap agreements; (2) the issuance of the debt obligations for yen; (3) the exchange of the borrowed yen for dollars pursuant to the currency swap exchange agreement; then, in a later year, (4) the exchange of dollars for yen pursuant to the same or an additional swap agreement for the purpose of satisfying petitioner's obligation under the debt obligations; and (5) the payments of interest and principal in yen according to the terms of the debt obligations. The dual currency debt obligations differed in that principal was payable in dollars, which matched in amount the dollars petitioner received in

---

[36] Exchange gain or loss may arise from the borrowing of foreign currency. In *National-Standard Co. v. Commissioner,* 80 T.C. 551 (1983), affd. 749 F.2d 369 (6th Cir. 1984), this Court relied upon *Fairbanks v. United States,* 306 U.S. 436 (1939), and *Gillin v. United States,* 191 Ct. Cl. 172, 423 F.2d 309 (1970), in holding that there was no sale or exchange upon retirement of a foreign borrowing where the funds used to retire the debt were acquired on the same date as the repayment of the debt. The amount of the ordinary gain or loss in that situation (full principal due on maturity) was the difference between the dollar value of the foreign currency obtained at the time of borrowing less the dollar value of the borrowing at retirement. This gain or loss is said to arise from speculation in foreign currency or foreign exchange risk, which ends when the foreign indebtedness is retired. See *American Air Filter Co. v. Commissioner,* 81 T.C. 709 (1983); *Bernuth Lembcke Co. v. Commissioner,* 1 B.T.A. 1051 (1925). We note that this Court has considered and rejected the theory that the borrowing of foreign currency should be treated as a short sale. See *National-Standard Co. v. Commissioner, supra.*

exchanging yen for dollars under the terms of the related currency swap agreement.

Both parties agree that exchange rate risk had been removed from the borrowing, assuming no counterparty default, since fluctuations in the public yen/dollar exchange rate would not affect the amount of dollars that petitioner would receive and the amount of dollars that petitioner would pay to retire its debentures. The amount of dollars FNMA received and paid was set in advance through the related currency swap agreements.

The first of respondent's two theories for disregarding the tax consequences of the currency swaps involves integrating the related transactions and is not compelling. We believe that the step-transaction doctrine is inapplicable since the steps comprising each yen borrowing in its entirety were not meaningless—they were genuine and had economic substance. See *Esmark, Inc. v. Commissioner,* 90 T.C. 171, 195 (1988), affd. without published opinion 886 F.2d 1318 (7th Cir. 1989) ("Whether invoked as a result of the 'binding commitment', 'interdependence' or 'end result' tests, the doctrine combines a series of individually meaningless steps into a single transaction"); *Tandy Corp. v. Commissioner,* 92 T.C. 1165 (1989); *Smith v. Commissioner,* 78 T.C. 350 (1982). Petitioner did not enter into these transactions in order to obtain tax benefits, but to secure financing; that is, dollars with which it could acquire and hold mortgages in its portfolio, at lower rates than those available in the United States. Further, with respect to a foreign borrowing, we have treated separately the borrowing and the use of the funds, although it was clear that the particular borrowing arose only for the sake of the underlying transaction. See *KVP Sutherland Paper Co. v. United States, supra*; *National-Standard Co. v. Commissioner, supra.* We note also that under the line of cases holding that hedging transactions receive ordinary treatment, the gains or losses for both the hedge and the underlying hedged transaction were determined separately although the character of these gains or losses was the same. *Stewart Silk Corp. v. Commissioner,* 9 T.C. 174 (1947); *Grote v. Commissioner,* 41 B.T.A. 247 (1940). Based on the foregoing, we find no compelling reason to

integrate the steps by which FNMA in effect borrowed U.S. dollars.[37]

Nor do we believe that the net loss should be denied on the basis that the exchanges of yen for dollars were not bona fide. Cf. *Scully v. United States,* 840 F.2d 478 (7th Cir. 1988); *Fender v. United States,* 577 F.2d 934 (5th Cir. 1978). Clearly, petitioner transferred all rights and interest in the yen it had borrowed when it swapped the yen for dollars pursuant to the related currency swap agreement. We also note that the currency swap agreements merely reduced exchange rate risk but did not eliminate it entirely, since FNMA remained principally liable on the debt obligations. Even if currency risk had been entirely eliminated, tax law does not integrate a hedge with the hedged transaction. See *Stewart Silk Corp. v. Commissioner, supra.*

Since we have decided that integration of the yen debt obligations and their related currency swap agreements is not proper and that the transactions were not shams, but bona fide, we must resolve whether the exchange of the yen, obtained from the issuance of the debt obligations in 1985 for dollars, pursuant to the related currency swap agreements, gave rise to gains or losses.

Petitioner claims that its tax basis in the borrowed yen was different from the amount of dollars it received pursuant to each of the currency swap agreements. Petitioner argues that the issue price of FNMA's yen obligations is to be determined on the closing date and is the fair market value of the yen on that date. See sec. 1273(b)(3)(B)(ii).[38] Petitioner maintains that this amount becomes the basis of the borrowed yen because there was no other consideration involved. Since the amount of dollars petitioner received pursuant to the currency swap agreements was not the same as the issue price

---

[37] Under sec. 988(d), a foreign currency borrowing and related currency swap agreements would be integrated and treated as a synthetic U.S. dollar borrowing. This section applies only to tax years beginning after Dec. 31, 1986. Tax Reform Act of 1986, Pub. L. 99-514, sec. 1261(e)(1), 100 Stat 2591. Moreover, sec. 988(d) was not intended to codify the then-current law regarding the proper tax treatment of such transactions. H. Conf. Rept. 99-841 (Vol. II) (1986), 1986-3 C.B. (Vol. 4) 1, 665. Thus, sec. 988(d) is not applicable to the issue before us.

[38] The Code section cited provides that the issue price of the debt instrument shall be the fair market value of the property received where the instrument is issued for property (yen here) (other than stock or securities) of a kind regularly traded on an established market, to the extent provided in regulations. We take judicial notice that Japanese yen are property of a kind regularly traded on an established market. Regulations under sec. 1273 have not been issued; we interpret sec. 1273(b)(3)(B)(ii) as calling for the use of fair market value in the present situation.

of the debt instruments according to petitioner's method of computation, petitioner concludes that the exchanges of yen for dollars in 1985 produced ordinary gains or losses.

The cost of property determines its tax basis. Sec. 1012. Petitioner's argument assumes that the tax basis of the borrowed yen is determined by the public exchange rate prevailing on the closing date. Instead we believe, as respondent alternatively argues, that in the circumstances of this case the basis of the yen received in exchange for the yen debt obligations is determined by the terms of the related currency swap agreement.

Petitioner asserts, and we accept, that the cost of the borrowed yen, which petitioner would not receive until the closing date, should be their fair market value.[39] In this instance, we believe that the terms of the currency swap agreements, under which petitioner agreed, prior to the bond issuance, to exchange the yen for dollars at a certain rate, established the fair market value of the yen received on the closing date of each yen borrowing, which was the issue date of the yen obligations.

The negotiations regarding each yen borrowing indicate that petitioner had a firm contract with an apparently responsible party or parties such that the value of the yen it would receive on closing equaled the dollars it would receive on the transfer of those yen for dollars, at a rate of exchange already agreed upon. We note that petitioner's purpose in issuing the yen denominated and dual currency debt obligations was to obtain a fixed amount of dollars; that petitioner undertook each yen borrowing because it had eliminated the risk that it would receive fewer dollars than it had bargained for as a result of a decrease in the value of the yen relative to the dollar on the closing date; that all of the currency swap agreements were conditioned on a related yen borrowing; and that the related currency swap agreements were negotiated at arm's length. As a result of the yen swap agreements, fluctuations in the yen/dollar exchange rate between pricing date and closing date became irrelevant for the purpose of determining gain or loss. We believe that on

---

[39] Although sec. 1273(b)(3)(B)(ii) applies only to certain property, respondent does not dispute petitioner's application of this section to the issuance of petitioner's yen debt obligations. Furthermore, respondent agrees that foreign currency acquires a basis equal to its fair market value on the date it is acquired.

the pricing date the parties' actions indicate that petitioner accepted that the value of the yen it was to receive on the closing date was equal to that of the dollars it was to receive in exchanging those yen.

That the related currency swap agreements were executed on or a few days after the pricing and subscription dates does not have any bearing on this issue. With respect to each yen debenture issuance, petitioner agreed on the pricing date to sell the borrowed yen for a fixed amount of dollars. The record here shows that the terms of all of the agreements related to the borrowing, including the currency swap agreements, were negotiated at arm's length and that petitioner and the other parties to the yen borrowing intended to and did abide by the terms of the various agreements reached on the pricing date. We conclude that the dollars that petitioner was to receive pursuant to the terms of the related yen swap agreements on the closing date represented the fair market value of the yen on the date when the yen borrowing occurred.

We agree that the sale of yen for dollars is to be treated as a separate transaction and recognized for tax purposes. However, no gain or loss arose from these swaps in 1985 since the tax basis of the yen, in each case, was the same as the amount of dollars realized. What may have occurred between petitioner and others later on with respect to these yen/dollars involves years not presently before the Court, and we express no opinion on it. As it relates to the year 1985, we decide this issue for respondent.

As the result of all the above,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

PARKER, SHIELDS, COHEN, CLAPP, SWIFT, JACOBS, GERBER, WRIGHT, PARR, WELLS, RUWE, COLVIN, BEGHE, and LARO, *JJ.,* agree with this opinion.

WHALEN, *J.,* concurs in the result only.

HAMBLEN, HALPERN, and CHIECHI, *JJ.,* did not participate in the consideration of this opinion.

APPENDIX A

Analysis of Foreign Currency Transactions

| | Euroyen 85-1 | Samurai 85-1 | Dual Currency 85-1 | Domestic Yen 85-1 | Dual Currency 85-2 | Syndicated Loan 85-1 |
|---|---|---|---|---|---|---|
| Debt offering | 6⅜% debenture due 1992 | 6.6% debenture due 1992 | 8% dual currency debenture due 1995 | 6.35% debenture due 1995 | 8% dual currency debenture due 1995 | 7.51 obligation due 1995 |
| Debenture subscription agreement date | 02/14/85 | 08/21/85 | 08/29/85 | 10/17/85 | 10/23/85 | 12/19/85 |
| Currency swap agreement date | 02/20/85 | 08/21/85 | 08/29/85 | 10/18/85 | 10/23/85 | 12/19/85 |
| Closing date | 02/20/85 | 08/28/85 | 10/01/85 | 10/24/85 | 11/01/85 | 12/19/85 |
| Lead debenture underwriter | Nomura | Nomura | Nomura | First Boston | Nomura | LTCB & Dai-Ichi |
| Target market of debenture | Europe | Japan | Europe | 50% U.S. 50% overseas | Europe | Japan |
| Yen debenture—face amount | ¥50,000,000,000 | ¥25,000,000,000 | ¥50,000,000,000 | ¥30,000,000,000 | ¥40,000,000,000 | ¥16,000,000,000 |
| Issue price | 100 | 100 | 101.375 | 100 | 101 | 100 |
| Yen debenture sale proceeds | ¥50,000,000,000 | ¥25,000,000,000 | ¥50,687,500,000 | ¥30,000,000,000 | ¥40,400,000,000 | ¥16,000,000,000 |
| Fees paid to underwriter | ¥994,500,000 | ¥605,000,000 | ¥1,000,000,000 | ¥195,000,000 | ¥800,000,000 | ¥80,000,000 |
| Net yen debenture proceeds received by FNMA available for swap | ¥49,005,500,000 | ¥24,395,000,000 | ¥49,687,500,000 | ¥29,805,000,000 | ¥39,600,000,000 | ¥15,920,000,000 |
| Swap counterparty (principal borrowing) | LTCB | LTCB | Nomura | Bank of Tokyo | Nomura | LTCB |
| Swap counterparty (interest borrowing) | LTCB | LTCB | LTCB | Bank of Tokyo | Dai-Ichi | LTCB |
| Initial swap exchange rate per currency swap agreement | Approximately 255.237 ¥/$ | 237 ¥/$ | Approximately 237.378 ¥/$ | 215.42 ¥/$ | 217.90 ¥/$ | 200 ¥/$ |
| $ to be received by FNMA per swap agreement | $192,000,000 | $102,932,489 | $209,318,297 | $188,357,627 | $181,734,741 | $79,600,000 |

APPENDIX A—Continued

Analysis of Foreign Currency Transactions

| | Euroyen 85-1 | Samurai 85-1 | Dual Currency 85-1 | Domestic Yen 85-1 | Dual Currency 85-2 | Syndicated Loan 85-1 |
|---|---|---|---|---|---|---|
| Fees paid to swap counterparty | $50,000 | - - - | $150,000 | $30,000 | $180,000 | - - - |
| Net $ received by FNMA per swap agreement | $191,950,000 | $102,932,489 | $209,168,297 | $138,327,627 | $181,554,741 | $79,600,000 |
| Final swap exchange rate per currency swap agreement | Approximately 255.237 ¥/$ | 237 ¥/$ | Approximately 207.9867 ¥/$ | 215.42 ¥/$ | Approximately 184.0265 ¥/$ | 200 ¥/$ |
| $ principal to be paid to swap counterparty at maturity of swap | $192,000,000 | $102,932,489 | N/A | $139,262,835 | N/A | $80,000,000 |
| ¥ principal to be received by FNMA from swap counterparty at maturity of swap | ¥50,000,000,000 | ¥25,000,000,000 | N/A | ¥30,000,000,000 | N/A | ¥16,000,000,000 |
| Debenture redemption at maturity (principal only) payable by FNMA | ¥50,000,000,000 | ¥25,000,000,000 | ¥240,400,000 | ¥30,000,000,000 | ¥217,360,000 | ¥16,000,000,000 |
| "All-in" cost[1] | 10.93% | 10.41% | 10.40% | 10.50% | 10.52% | 9.25% |

[1] Computed using semi-annual compounding except for Domestic Yen 85-1 which was computed using annual compounding.

APPENDIX B
FNMA's Compilation of Gain/(Loss) on Currency Swaps

| | Euroyen 85-1 | Samurai 85-1 | Dual Currency 85-1 | Domestic Yen 85-1 | Dual Currency 85-2 | Syndicated Loan 85-1 | Total |
|---|---|---|---|---|---|---|---|
| Debt offering | 6⅞% debenture due 1992 | 6.6% debenture due 1992 | 8% dual currency debenture due 1995 | 6.35% debenture due 1995 | 8% dual currency debenture due 1995 | 7.51 obligation due 1995 | --- |
| Closing date | 02/20/85 | 08/28/85 | 10/01/85 | 10/24/85 | 11/01/85 | 12/19/85 | --- |
| Currency swap agreement date | 02/20/85 | 08/21/85 | 08/29/85 | 10/17/85 | 10/23/85 | 12/19/85 | --- |
| Exchange rate per currency swap agreement | Approximately 255.237 ¥/$ | 237 ¥/$ | Approximately 237.378 ¥/$ | 215.42 ¥/$ | 217.90 ¥/$ | 200 ¥/$ | --- |
| Wall Street Journal (WSJ) spot exchange rate on closing date | 261.08 ¥/$ | 236.85 ¥/$ | 213.30 ¥/$ | 216.46 ¥/$ | 208.75 ¥/$ | 202.95 ¥/$ | --- |
| Net yen debenture proceeds received by FNMA available for swap on closing date | ¥49,005,500,000 | ¥24,395,000,000 | ¥49,687,500,000 | ¥29,805,000,000 | ¥39,600,000,000 | ¥15,920,000,000 | --- |
| Amount received (dollars) pursuant to currency swap agreement on closing date | $192,000,000 | $102,932,489 | $209,318,297 | $138,357,627 | $181,734,741 | $79,600,000 | --- |
| Fair market value (dollars) of yen on closing date using WSJ spot exchange rate | $187,738,957 | $102,997,677 | $232,946,554 | $137,692,876 | $189,700,599 | $78,442,966 | --- |
| Gain/(loss) (dollars) on currency swap on closing date per petitioner's litigation position | $4,261,043 | ($65,108) | ($23,628,257) | $664,751 | ($7,965,858) | $1,157,034 | ($25,576,475) |
| Gain/(loss) (dollars) currency swap on closing date per return | -0- | -0- | ($23,628,257) | $594,743 | ($8,147,781) | -0- | ($31,181,295) |